Argued December 14, 1960, affirmed March 1, 1961

## OREGON METHODIST HOMES, INC., WILLAMETTE VIEW MANOR, INC. *v.*
## STATE TAX COMMISSION
360 P. 2d 293

*Paul R. Biggs,* Oregon City, and *Cleveland C. Cory,* Portland, argued the cause for appellants. With Mr. Biggs on the briefs were John O. Sheldahl, Oregon City, and Hart, Rockwood, Davies, Biggs and Strayer, Portland.

*Richard Rink,* Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Robert Y. Thornton, Attorney General, Salem, and Winston L. Bradshaw, District Attorney, Oregon City.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, SLOAN, O'CONNELL, GOODWIN and HOWELL, Justices.

WARNER, J.

Petitioner Oregon Methodist Homes, Inc., commenced this proceeding in the Circuit Court for Clackamas County pursuant to ORS 306.545 to obtain a review of an order of the State Tax Commission, made May 1, 1958, confirming the action of the County Assessor for Clackamas County, in placing certain property of petitioner on the tax rolls of that county for the 1957-1958 tax year and denying petitioner's claim of exemption as a charitable institution. From the order of the circuit court denying the petition and affirming the order of the Commission, petitioner and intervener appeal.

The particular property of petitioner for which exemption is sought is a parcel upon which it erected a building for the residential accommodation of retired persons. It is known as the Willamette View Manor and hereinafter called the Manor.

Subsequent to the institution of the instant proceeding and on or about October 3, 1957, petitioner transferred all its right, title and interest in and to the real and personal property constituting the Manor to Willamette View Manor, Inc., the intervener, a corporation organized on or about January 31, 1957. We will hereinafter refer to the second corporation as the intervener.

Two questions are presented by the appeal: (1) was petitioner a benevolent and charitable institu-

tion as of January 1, 1957, and, if so; (2) was any part of the subject property occupied or used actually and exclusively in benevolent and charitable work as of that date so as to entitle it under the provisions of ORS 307.130 (as it was prior to amendment in 1959) to an exemption from ad valorem taxes. That section then read:

"(1) Upon compliance with ORS 307.170, the following property owned by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a) Except as provided in ORS 740.080,[1] only such real or personal property, or portion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions.

"(b) Parking lots maintained solely for the use, without charge, of persons going to and from the property exempted under paragraph (a) of this subsection, but not if such lots are used for parking or other purposes not connected with the use and maintenance of such property.

"(2) The liability of any such institution for payment of principal or interest on any obligation of the institution, whether direct or assumed, shall not deprive it of the exemption otherwise allowable under subsection (1) of this section."

Evaluations for the purposes of assessment are made as of January first for each tax year. See ORS 308.210 and 308.215 (as they were prior to amendment by Oregon Laws 1957, ch 324, p 434). We accent the date January 1, 1957, because the issues are narrowed to a claim of exemption for the tax year 1957-1958.

The first statute granting exemptions to benevolent, charitable and scientific institutions was enacted

_____

[1] ORS 740.080 relates only to "fraternal benefit societies." Petitioners do not claim to be in that classification.

in 1854. Although the statutes relating to exemptions from ad valorem taxes were subsequently amended in many different particulars, the original wording of that part relating to exemptions granted to benevolent, charitable and scientific institutions remained intact for more than 90 years. It was amended for the first time in 1945 (Oregon Laws 1945, ch 296, p 440) and received no further legislative attention until 1955 (Oregon Laws 1955, ch 576, § 1, p 692).

From a reading of the amendments made in 1945 and 1955 it will be observed that the legislature has in later years inclined more to a restriction of the exemption privilege than to its relaxation.

On January 1, 1957, the property in question was owned by petitioner Oregon Methodist Homes, Inc. As noticed above, the intervener was not in existence on that date and did not acquire its title until a time subsequent to October 3, 1957. It, therefore, follows that our interest in the tax status of the owner is necessarily narrowed to what it was as of January 1, 1957. Nor can we be interested in the happening of anything subsequent to that date which perchance gave any charitable character to the Manor over and above what petitioner was entitled to claim at that time.

Petitioner relies upon the proposition that it is a benevolent and charitable institution as evidenced by the fact that it supplies care, attention and security required by aged persons and contends that notwithstanding such persons are able to pay for such services, it is, nevertheless, as much a charitable and benevolent pursuit as would be the relief of their financial needs.

Petitioner was organized as a nonprofit organiza-

tion in September, 1951, under the provisions of ORS 61.010 to 61.160, inclusive.

Article IV of the corporate articles of petitioner, as amended in 1954, reads:

"The objects, business or pursuit of said corporation shall be for the purpose of constructing and maintaining a home for the aged who may be members of the Methodist Church or of any other church or any other individual of good moral character who would be at home in a christian environment; *to own, construct, operate and maintain a hospital for the aged; for use as a nursing home; and as a hospital for general and specialized purposes for the general public*; to purchase and hold title to real property and personal property; to prescribe regulations and rules for those living in the home; to solicit funds, receive subscriptions, gifts, grants and bequests, to establish, endow, and hold the investments and assets of the corporation and to do each and everything necessary in order to own and maintain a home and place of residence for the aged, *and hospital*." (Emphasis supplied.)

The underscored words in the foregoing article were added by the amendment of 1954 in order to give petitioner authority to acquire, build and operate a general hospital on adjacent land acquired from the previously operated Matson Memorial Hospital. At the time of the hearings in the matter the building of such a hospital was contemplated. It was, however, to be separate and apart from the operation of the Manor. One of the prime reasons for the transfer of the Manor property in October, 1957, from petitioner to the intervening corporation was to avoid any conflict in management and possible impairment of the Manor's separate financial structure.

The record is replete with evidence that the Reverend Edward Terry and, later, others who pioneered

the organization subsequently incorporated in 1951 as Oregon Methodist Homes, Inc., and the officials who thereafter succeeded them, were from the beginning imbued with an idea that at some future time the Manor might attain a financial status that would enable it to extend its services to the indigent elderly on a charitable basis; that is, by charging only to the extent of such person's ability to pay or without any charge whatsoever. But as of January 1, 1957, it is clear that their charitable aspirations were only a praiseworthy, but nebulous, hope.

In the beginning and for sometime afterward those responsible for the overall plan expected to achieve that goal from gifts and donations. But this concept of voluntary contributions failed to gain any response. After a long series of solicitations, carried on initially by volunteers and later by professional money-raisers for like causes, they found it necessary to completely abandon their earlier ambition to raise funds in that manner and to shift to the plan of financing known as "founder's" contracts.

Pursuant thereto contracts were entered into between petitioner and various persons known as "founders," whereby each founder prepaid to the corporation a certain sum known as a founder's fee. These originally varied from $4,800 to $20,000, depending upon the amount of space in the Manor which a given founder would be privileged to occupy in return for the amount paid as a founder's fee. The minimum founder's fee was later increased from $4,800 to $7,000. In return for this "founder's fee," the party acquired a contractual lifetime right to occupy a specified apartment in the Manor and to receive "life care" at a cost of not to exceed $100 per month.

There were no restrictions as to race, creed or

color, but all applications were subject to petitioner's rule: "If, for any cause, physical or otherwise, the applicant is found objectionable, such applicant will not be received." An inquiry was also made as to the financial status of the applicant, for as Mr. Mummery, the administrator of the Manor, stated, the petitioner had to be reasonably sure that the founders were not only able to pay their "founder's fee," but also the monthly "life care cost." Or, as Mr. Seth Leavens, one of petitioner's trustees testified, this was done "because up to the present time particularly [the date of the hearing] we didn't have money enough to carry on if that person didn't have enough means to come in and to stay there. We didn't have any endowment built up so we had to know that the party was financially able to come and stay."

The contract with each founder further provided that failure to pay the monthly "life care" obligation entitled petitioner to declare the contract "null and void to any further rights thereto * * * or any rights to money" previously paid thereon. It also required a founder to pay such sum as the court should adjudge as attorney fees in the event of any suit or action.

Each founder was also accorded the right of naming a successor to the occupancy of his space in the Manor when he passed away. Such successors were to have the privilege of occupying the founder's space and living there for the rest of his or her life, provided they were morally and physically acceptable to the corporation. Such successors were not guaranteed "life care" at the rate of $100 per month, but at such rate as might be established on entry. Included in the "life care" were the founder's meals, infirmary

care, doctors, nurses, room service, maid service, laundry, heating, lights, water and upkeep.

The founder's fees proved to be a most successful method of financing and entirely adequate to pay for the land, construct the buildings, purchase the furnishings and to build a sewage disposal plant, sprinkler system, hospital equipment and the like, all of which when finished represented a total investment of $2,891,000. No gifts or donations were received to apply to those costs.

By January 1, 1955, construction of the Manor was nearly completed and some of the founders began to occupy their respective quarters. It was a substantial structure of concrete and steel with 234 apartments and a 24-bed infirmary for the use of the founders. As of the date of the hearing it was completely occupied by 296 persons, being the founders and their respective spouses. When the Manor was finished, it was a debt-free institution.

The record warrants the observation that this financing of the Manor, exclusively by the founder's fees, stands as a tribute to all who were responsible for that result. It was, indeed, so unique in its financial conception and so successful an attainment that as of the time of the hearing it was the only retirement home of its kind in the United States of the many already in operation in other states, particularly in California, which had come into being free of debt and without the aid of voluntary gifts or contributions from others.

The following rules and statements of law have over the years been many times reiterated and applied by this court and presently point the way to our final conclusions.

██ Taxation is the rule and exemption from taxation is the exception. *Corporation of Sisters of Mercy v. Lane County,* 123 Or 144, 152, 261 P 694; *Benton County v. Allen,* 170 Or 481, 484, 133 P2d 991. Moreover, statutes exempting property are strictly construed and an exemption is denied unless it is so clearly granted as to be free from reasonable doubt. *Behnke-Walker v. Multnomah County,* 173 Or 510, 521, 146 P2d 614; *Methodist Book Concern v. State Tax Commission,* 186 Or 585, 592, 208 P2d 319.

█ Such statutes will be construed most strongly against those petitioning for the exemption (*Behnke-Walker v. Multnomah County,* supra, at 522; *Hibernian Benevolent Society v. Kelly,* 28 Or 173, 42 P 3); and if an institution is entitled to the privilege of exemption, the property must fall strictly within the statute. *Benton County v. Allen,* supra, at 484. Charities in this state enjoy no inherent right to exemption from taxation and are immune only in so far as they may be specifically exempt by constitutional provision or statutory enactment. *Security Sav. & Trust Co. v. Lane County,* 152 Or 108, 141, 53 P2d 33. Nor is there a presumption of implied exemption in their favor. *Unander v. U. S. National Bank,* 324 Or 144, 355 P2d 729.

█ Immunity from taxes on the ground of being a public charity is an affirmative defense and the burden of establishing the eleemosynary character of an institution is upon the party asserting it. *Ackerman v. Physicians & Surgeons Hospital,* 207 Or 646, 659, 298 P2d 1026; 14 CJS 551, Charities § 75. In this connection it should also be remembered that hospitals, as such, are not necessarily public charities and hence enjoy no inalienable rights to exemption. *Corporation*

*of Sisters of Mercy v. Lane County,* supra, at 153; *Benton County v. Allen,* supra, at 484.

■ The question as to whether a given hospital is a charity is to be determined in the case of an incorporated hospital not only from its powers as defined in its charter, but also from the manner in which it is conducted and such prima facie evidence as its articles may accord can be rebutted by evidence that the corporation has not in fact lived up to its chartered objects. *Hamilton v. Corvallis General Hospital Assn.,* 146 Or 168, 176, 30 P2d 9; *Carson v. Schulderman,* 79 Or 184, 154 P 903; *Benton County v. Allen,* supra, at 485; *Ackerman v. Physicians & Surgeons Hospital,* supra, at 660; 14 CJS 423, supra, § 2(e). This is a sound and salutary rule. It is one reflecting human experience. Unselfish declarations of intended purpose and promises of future worthy endeavor are many times rendered meaningless by inaction and should give the declarer no preferred status unless ultimately resolved into concrete and tangible reality.

To the foregoing rules of law petitioner would have us add another in keeping with its thesis that if the Manor is not a charitable institution entitled to exemption, it is a "benevolent" one, and as such is entitled to claim an exemption under ORS 307.130 in that character. In its brief it argues: "While this Court has distinguished between the terms 'benevolent' and 'charitable', it has never, so far as we have been able to determine, expressly decided whether every benevolent institution, to be entitled to tax exemption, must be charitable."

■ Notwithstanding diligence of counsel, the precise question has been answered to the contrary of petitioner's contention by BAILEY, C. J., in *Behnke-Walker v. Multnomah County,* supra (173 Or at 519). It stands

as authority for the proposition that the word "benevolent" used in connection with the word "charitable," as used in the statute, is synonymous therewith.

We now give our attention to the manner in which the Manor was being conducted on and before January 1, 1957.

This court has many times addressed itself to a determination of whether a given hospital was or was not in fact a charitable institution entitling it to exoneration from taxes or to an immunity to judgments for negligence. Although the Manor is not a hospital in the common use of that term, as were the institutions in the cases to which we will now make reference, nevertheless, if it is what petitioner claims for it, it more nearly approximates the character of a hospital than do any of the other institutions which have heretofore sought tax exemption or exoneration from liability for negligence.

We, therefore, turn to what are the main "hospital" cases to find what elements have received our consideration in persuading us to a conclusion that the entity was or was not a charity.

■ Such review reveals that weight has been accorded to the presence or absence of the following facts, that is: (1) Whether the receipts are applied to the upkeep, maintenance and equipment of the institution or are otherwise employed (*Sisters of Mercy,* supra, at 156; *Benton County,* supra, at 484; *Gregory v. Salem General Hospital,* 175 Or 464, 468, 153 P2d 837; *Physicians & Surgeons,* supra, at 663); (2) Whether patients or patrons receive the same treatment irrespective of their ability to pay (*Sisters of Mercy,* supra, at 156; *Waller v. Lane County,* 155 Or 160, 164, 63 P2d 214; *Salem General Hospital,* supra, at 468); (3) Whether the doors are open to rich and

poor alike and without discrimination as to race, color or creed (*Sisters of Mercy,* supra, at 156; *Waller,* supra, at 164; *Benton County,* supra, at 491; *Salem General Hospital,* supra, at 468; *Physicians & Surgeons,* supra, at 663); (4) Whether charges are made to all patients and, if made, are lesser charges made to the poor or are any charges made to the indigent (*Corvallis Hospital,* supra, at 181; *Salem General Hospital,* supra, at 468; *Physicians & Surgeons,* supra, at 668); (5) Whether there is a charitable trust fund created by benevolent and charitably-mined persons for the needy or donations made for the use of such persons (*Corvallis Hospital,* supra, at 185; *Waller,* supra, at 164; *Salem General Hospital,* supra, at 469; *Physicians & Surgeons,* supra, at 665); (6) Whether the institution operates without profit or private advantages to its founders and the officials in charge (*Sisters of Mercy,* supra, at 156; *Corvallis Hospital,* supra, at 183; *Benton County,* supra, at 485; *Salem General Hospital,* supra, at 467; *Physicians & Surgeons,* supra, at 660, 663, 664).

In addition to the foregoing, in *Physicians & Surgeons,* supra, at 665, we also gave attention to the articles and bylaws of the corporation to ascertain what provisions, if any, had been made to dispose of its surplus assets on dissolution.

We do not hold that all the foregoing factors must be present before a given institution can be declared one of charitable or noncharitable pursuits. Nor do we say that the list includes all items which may assist in a conclusion respecting the charitable or noncharitable status of a given corporation. The itemization represents only those particulars which have been in the past employed by this court in discovering if a given hospital is or is not in fact eleemosynary.

In terms of the foregoing factors bearing on petitioner's claim of charitable character, we find as of January 1, 1957, and prior thereto: that the Manor's receipts were applied to the expense of maintaining the resident founders and surpluses placed in reserve for the upkeep and equipment of the institution; that in terms of "life care," i.e., provided for by the monthly charge of $100, the founders receive equal service and treatment. We also find that when the Manor's facilities are not occupied by prepaying founders, its doors are open without discrimination as to race, color or creed, but, however, only to those who can pay the founder's fee or its equivalent and whose financial status at the time of entry gives assurance that they can make the monthly "life care" charges accruing during the period of their residency; and that such charges are made to all who reside there with no discounts to the less opulent and no free or charity service to the indigent. We note again that failure of the founders or their successors to pay the monthly charges becomes a warrant to petitioner to deny them further residential privileges.

We have reserved comment on items (5) and (6) of the foregoing enumeration of charitable and noncharitable indices for separate comment because the absence of profit and the presence of funds and donations for charity use are among the two almost universally applied in tests of charitable character and to the extent that the absence of either can overturn any claim to charitable exemption.

The fact that a given institution may be a nonprofit corporation does not conclusively endow it with the attributes of a charity, nor does the fact that it operates with a loss. *Hamilton v. Corvallis Hospital Assn.*, supra (146 Or at 185). ORS 61.010 through

61.160, under which the Manor was incorporated, were sections of the law, prior to 1959, likewise available for the incorporation of many types of nonprofit companies such as "telephone, power, water companies and cooperative associations." (See ORS 61.130 as it was before repeal in 1959).

We do not find that any of the Manor's founders or sponsors are deriving any direct personal benefits corresponding to dividends from the operation of the Manor, nor do we find that any of its managing trustees are obtaining financial or other personal advantage, nor that the administrative supervisors or help are receiving compensation above what might be called the usual scale for their services. But we do note that during the year 1955 (and also in 1956) the Manor was not operating at a loss. It was netting $3,500 to $4,000 per month over and above operating expenses. The surpluses were derived from the total monthly "life care" payments of $100 made by each resident founder and were held as a reserve to cover unforeseen contingencies of operation.

So far as the financial operations of the Manor were concerned, as of January 1, 1957, and prior thereto, it was not only free from debt, but operating without loss and rendering no species of charitable service to any person or persons. Indeed, as of the assessment date and for sometime thereafter, the Manor had no need for donations nor was it in a position to extend charitable services, as its accommodations were completely occupied by the founders or their duly-appointed successors.

In *Hamilton v. Corvallis Hosp. Assn.,* supra (146 Or 168), Mr. Justice BAILEY, speaking for this court, said at p 185:

"An important feature * * * is the absence of any charitable trust fund for the defendant

[corporation] to administer. There is no income from a fund or funds created by 'contribution of benevolent and charitably minded persons' to be used by the association in relieving the distress of the needy.  \* \* \*"

See, also, *Ackerman v. Physicians & Surgeons Hospital,* supra (207 Or 646), at 666; 14 CJS 417, n 58, supra, § 2.

In anticipation of the receipt of certain testamentary gifts from founders the petitioner's trustees adopted the following resolution:

> "Resolved that the Oregon Methodist Homes, Inc. establish an endowment fund into which shall be placed all gifts and bequests designated for it, and such other funds as in the judgment of the Executive Committee are required or warranted after the proper reserves for its needs and obligations have been created, and that the income from such fund be used for the care of any residents of the Manor who shall be in need of assistance or for the establishment of residence and care for needy and worthy persons who would otherwise be dependent solely upon charity or for the proper installations or repairs, other funds being unavailable, be required for the preservation of the Manor or the comfort of its residents."

Petitioner places great reliance upon it as a demonstration of its charitable character. It was adopted on an uncertain date, either about the last of December, 1956, or in the early part of January, 1957, according to Mr. Mummery. But whether adopted before or after January 1, 1957, it was at best only a declaration of fine intentions to do something in the future, and that, probably not sooner than late in 1957, for it is evident at the time of its adoption there were no funds available for any of the charitable uses to which the resolution makes reference.

Between the time of the first hearing (July 23, 1957) and the second, or supplementary, hearing (October 5, 1958), the Manor came into possession of some moneys that were placed in the endowment fund. Some of this was used to supplement the finances of a few persons in the Manor as of that later date. When asked when this free or charitable service began, the administrator replied, "Several months ago. I would say seven or eight months ago we took our first people in." Thus it is apparent that as of July 23, 1957, it held no funds of any kind available for charitable work and did not come into possession of such funds until after that date, from whence it made its first charitable benefactions. According to Mr. Mummery, that would be sometime in February or March, 1958, over a year after the date of assessment. The extent of these benevolences is not revealed.

In *Oregon Physicians' Service v. State Tax Commission,* 220 Or 487, 349 P2d 831 (1960), the plaintiff was a nonprofit organization, organized under the provisions of ORS, ch 61, as was the petitioner. Its purpose was to provide prepaid medical service for its members. It is sometimes referred to as a Blue Shield Agency. There, plaintiff sought exemption from the payment of corporate excise taxes, relying on ORS 317.080(6) as being an organization "not organized for profit but operated exclusively for the promotion of social welfare  *  *  *  and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes, and no part of the net earnings of which inures to the benefit of any private stockholder or individual."

In holding against the plaintiff organization in that case, Mr. Justice Rossman declared at pp 506 and 507:

"*  *  *  If the 'dominant and controlling' mo-

tive of the taxpayer is 'primarily to benefit the taxpayer's membership economically, and only incidentally to further larger public welfare,' then the exemption must be denied. A rule of thumb capable of serving the purposes of ORS 317.080(6) in cases of this kind would very likely envision that in order for the activities of a taxpayer to entitle him to exemption as 'social welfare' work they must be calculated to benefit some other group than the one which supplies the money and directs its disposition. The group benefited may be large or small, definite or indefinite in number, but in the benefaction some motive of altruism must clearly shine forth.

"That is not the case here. Oregon Physicians' Service is a medical insurance company, and its members can have no motive beyond insuring themselves against the expenses of illness. Commendable as that may be, it is a self-regarding purpose. The company is carried on for no other reason. Even if the plaintiff devoted its entire income above expenses to charity, we would be obliged to deny the exemption. For while it is now clearly established that a charity may carry on some commercial business without losing its exemption [citing authorities], we think it is equally clear that an organization of a commercial character which obviously exists only for the benefit of its members can not claim exemption from taxation even though it pays no dividends or devotes its entire profits to charity [citing authorities]."

Although the exemption sought in the Oregon Physicians' Service case was made under a different tax statute from that depended upon by petitioner in the instant matter, we find a strong parallel in the position of the two moving parties. Paraphrasing in part the words of Justice ROSSMAN, it can here be said that as of January 1, 1957, the dominant and controlling motive of the Manor was primarily to benefit

the founders economically and not with a purpose or means of furthering works of charity. The Manor at that time and for more than a year afterward had no other purpose than to insure to the founders the benefits it had obligated itself for under the terms of its contracts with them. "Commendable as that may be, it [was] a self-regarding purpose." (220 Or at 507)

Turning to the Manor's articles of incorporation, its sale prospectus, the form of its very business-like contracts made with each founder, and also to petitioner's bylaws and "General Rules," we find nothing therein to indicate, directly or indirectly, that the founders had any idea that they were becoming parties to a charitable enterprise, then or later. In the prospectus, particularly, the emphasis was upon happy, comfortable and economical living for those who could afford to pay the prices stipulated. In making that observation, we do not imply that those responsible for the successful financing of the Manor indulged in any misrepresentations when securing founder's contracts. Nor do we say that the hope nursed by some of the pioneers who promoted the enterprise that the Manor might at some future day render charitable services, was an unworthy one or beyond the possibility of ultimate attainment.

Before arriving at our conclusion in *Ackerman v. Physicians & Surgeons Hospital,* supra, we examined the article of its corporate charter relating to the disposition of its assets on dissolution and found that it provided that the "donations" made by its members were to be repaid to them after the payment of the corporate debts. So finding, we held, "the donations of the members are therefore in a sense contingent charities, or contingent debts." (207 Or at 665)

The contributions of the founders and subsequent

"members" likewise lose meaning as charitable gifts when we take notice of ORS 61.140 before its repeal by Oregon Laws 1959, ch 580, p 1052, and then turn to examine the bylaws and articles of incorporation of petitioner.

ORS 61.140 provided for the method of dissolution of "Any religious, charitable or educational corporation organized under the laws of the State of Oregon." It also made provision for the disposition of any surplus remaining upon dissolution. In so far as pertinent and controlling here, it reads:

> "*Any religious, charitable or educational corporation organized under the laws of the State of Oregon* pertaining to corporations of that class, or crematory or cemetery association, may at any meeting of its members called for the purpose, by vote of three-fourths of the members present, authorize its dissolution and provide for the settling of its business and disposing of its property. * * * The assets of the corporation shall be apportioned according to the articles of incorporation or the bylaws and in event of conflict then by the bylaws. In the event no provision for dissolution is made in either the articles of incorporation or bylaws, the division shall be made in accordance with the interest of each member according to his contribution to the assets of the corporation." (Oregon Laws 1933, ch 187, § 1, p 261) (Emphasis supplied.)

That part of the foregoing quotation from ORS 61.140 which authorizes an apportionment of the assets according to provisions of the articles of incorporation, and in the absence of such provision, then to the members according to their respective contributions, involves a statement of law contrary to generally accepted concepts pertaining to charitable trusts and charitable corporations; namely, that charitable

trusts continue in perpetuity and that a charitable corporation is merely a trustee or agent for administering funds given for charitable purposes. Upon dissolution of such a corporate trustee equity will not suffer the trust to fail for want of a successor trustee. Zollmann, American Law of Charities, 332 § 476. These principles were discussed and applied in *Wemme v. First Church of Christ,* 110 Or 179, 219 P 618, 223 P 250. That case, however, was decided in 1924 and the contrary statutory rule embodied in ORS 61.140, supra, was enacted in 1933.[2]

Although empowered by ORS 61.140 to do so, petitioner failed to exercise the privilege conferred by that statute to amend its articles prior to January 1, 1957, or after, so far as we are apprised, so as to insure that on liquidation of petitioner, its surplus assets would be irrevocably transferred to some other nonprofit charitable organization and not inure to the benefit of any private person. Hence, any division of property made on dissolution would be in accordance with the contribution of each member to the assets of the corporation. As a result, and as said in the Ackerman case, supra, "The donations of the members [here founders] are therefore in a sense contingent charities, or contingent debts of the hospital." Much is thereby subtracted from petitioner's claim as a charity.

In terms of taxability, the Manor from the time of its initial occupation in January, 1955, to January 1, 1957, was precisely in the same status as if it had been organized and the Manor built by the same occu-

---

[2] ORS 61.140 was repealed by Oregon Laws 1959, ch 580, § 104, a comprehensive statute dealing with nonprofit corporations. Oregon Laws 1959, ch 580, § 48, now codified as ORS 61.530(3), provides for the distribution of assets on the dissolution of corporations having the character of the petitioner and embodies the principles discussed and applied in Wemme v. First Church of Christ, supra, in essence requiring that such assets be transferred to "organizations engaged in activities substantially similar to those of the dissolving corporation."

pants voluntarily banded together as a nonprofit cooperative, paying the same amounts to initial cost and maintenance and receiving the same services now offered by the Manor and treating their initial contributions to the capital investment (founder's fees) as a prepayment of rent for the period of their respective lives. If the position of petitioner is sound, then it is obvious that persons of advanced age could avoid ad valorem taxes by pooling their assets in corporate form for their mutual benefit. But we do not believe that such was the intent of the exemption statute as previously construed by the decisions of this court.

We have considered all the cases cited by petitioner. We mention, however, only two because of the reliance which petitioner places upon them. They are: *Fredericka Home for the Aged v. San Diego County,* 35 Cal2d 789, 221 P2d 68 (1950), and *Fifield Manor v. County of Los Angeles,* 10 Cal Rep 242 (Jan 3, 1961). A copy of the last decision was supplied by petitioner's counsel shortly after the date of its rendition.

In the Fredericka case we find plaintiff to be a nonprofit corporation operating a home for elderly persons in substantially the same manner petitioner operates the Manor. But the financing plan for its successful maintenance is substantially different from that of the Oregon institution. These prime differences were made the basis for the California court's holding that the Fredericka Home was a charitable institution. We summarize as follows: The Fredericka Home received 15 acres of land as a gift and later erected buildings thereon which were donated; a trust fund of $200,000 was subsequently given to it; "* * * approximately 35 per cent of [its] income came from interest on the endowment fund [$200,000] and from

donations, while only about 65 per cent came from fees of the inmates." (221 P2d 71)

Fifield Manor follows closely the operational pattern of the Fredericka Home; and the court in Fifield leans heavily upon the Fredericka case in reaching its conclusions. In Fifield, as in Fredericka, we find that the corporation had its start from contributions and operated with heavy losses, the actuarially computed deficits being in excess of $4,300,000. Losses were met "by donations from charitable-minded persons." Fifield denied no person because of inability to pay "all or part of an admission fee."

■ None of these elements so persuasive with the California court are present in the instant matter. Here, there are no gifts of land and buildings; no endowment fund; no gifts from outsiders to offset the operating losses, and no need therefor because of the absence of operating losses; no readiness from January 1, 1955, to January 1, 1957, to admit any person who could not pay all of the founder's fee. The conclusions of the Fredericka and Fifield cases can have no persuasive force here under the circumstances there present.

Because of what we have had to say concerning ORS 61.130, supra, we note from our reading of the last-mentioned California cases that the statute of that state granting tax exemptions to charitable organizations (§ 214, California Revenue and Taxation Code [as amended in 1953 and 1955]) limits the immunity privilege unless the corporation meets seven specifications of charitable character enumerated in § 214. The sixth specification provides that the property of a corporation claiming a charitable status must be "irrevocably dedicated to religious, charitable, scien-

tific, or hospital purposes and upon the liquidation, dissolution or abandonment of the owner will not inure to the benefit of any private person except a fund, foundation or corporation organized and operated for * * * charitable purposes." Thus, it is evident that had petitioner been a California corporation seeking tax exemption, and had all of the charitable attributes it claims here, it would have, nevertheless, been denied in California the privilege of exemption because of its inability to meet the sixth condition relative to the disposition of its property on dissolution, unless it had previously amended its corporate articles in the manner authorized, but not compelled, by ORS 61.130.

Petitioner argues that decrees entered in two suits heard in the Circuit Court for Clackamas County stand as final determinations of its charitable character and, therefore, res judicata on the subject. We have examined the records in evidence with respect to that litigation and are not so persuaded. Among other things, there is not an identity of issues or matters essentially connected therewith. *Ruckman v. Union Railway Co.*, 45 Or 578, 78 P 748; *Wagner v. Savage, as Adm'r.*, 195 Or 128, 146, 244 P2d 161. The first decree relied upon was entered November 29, 1954, in a suit wherein Matson Memorial Hospital was plaintiff and Robert Y. Thornton, as Attorney General of the State of Oregon, and others, were defendants (but not including petitioner Oregon Methodist Homes, Inc.) The suit had been brought for the purpose of authorizing the plaintiff to transfer its property to petitioner that the latter might carry out and put into effect the charitable purposes of the Matson Hospital. The property involved in that suit was adjacent to, but no part of, the property subject to liti-

gation in this matter. The second decree upon which plaintiff relies was entered October 4, 1957, in a suit wherein petitioner was plaintiff and Thornton, as Attorney General, was defendant. The object of the suit was to authorize a transfer of the assets of the Manor from petitioner to the intervener and present owner.

We intimate no opinion as to what may be the charitable status of petitioner or its property known as Willamette View Manor entitling it to tax immunity at the time of an assessment made subsequent to January 1, 1957. At this time we say no more than petitioner has not sustained the burden of showing it was a charitable institution as of the date and we, therefore, hold it was not eligible to immunity as to its 1957-1958 taxes.

Holding as we do with respect to the noncharitable character of petitioner on the critical assessment date, we do not reach the secondary question advanced by the appeal, i.e., whether any part of the subject property "or portion thereof [was] actually and exclusively occupied or used in the * * * charitable * * * work carried on by such institution[s]." (ORS 307.130, supra)

The decree of the circuit court is affirmed. The parties will pay their own costs.