Argued and submitted September 5, the decision of the Tax Court affirmed
December 28, 1989, reconsideration denied February 6, 1990

YOUNG MEN'S CHRISTIAN ASSOCIATION
OF COLUMBIA-WILLAMETTE,
*Appellant,*

*v.*

DEPARTMENT OF REVENUE,
*Respondent,*

*and*

THE COURT CLUB, INC., et al,
*Respondents.*

(OTC 2717; SC S35831)

784 P2d 1086

Thomas H. Tongue and G. Kenneth Shiroishi, Portland, argued the cause for appellant. With them on the briefs were Jeffrey F. Nudelman and Dunn, Carney, Allen, Higgins & Tongue, Portland.

Ted E. Barbera, Assistant Attorney General, Salem, argued the cause for respondent, Department of Revenue. With him on the brief was Dave Frohnmayer, Attorney General, Salem.

Michael J. Morris, argued the cause and filed the brief for respondents, The Court Club, Inc. and Northwest Alliance For Market Equality.

Arno H. Denecke, Salem, filed a brief on behalf of *amicus curiae* The Oregon Cluster of YMCAs.

Before Peterson, Chief Justice, and Linde, Jones, Gillette, Van Hoomissen, Fadeley, Justices, and Campbell, Justice pro tempore.

FADELEY, J.

## FADELEY, J.

This appeal from the decision of the Oregon Tax Court turns on the meaning of the word "charitable" in the property tax exemption statutes. ORS 307.130(1)(a) provides in part:

"[T]he following property owned or being purchased by incorporated * * * charitable * * * institutions shall be exempt from taxation:

"(a)  * * * only such real or personal property * * * as is actually and exclusively occupied or used in * * * charitable * * * work carried on by such institutions."

Following receipt of an alternative writ of mandamus from the Tax Court, the Multnomah County Assessor decided to place all real and personal property of the Young Men's Christian Association of Columbia-Willamette (YMCA-CW) in that county on the tax rolls in 1985, ending the exemptions from taxation granted by his predecessors. YMCA-CW appealed to the Department of Revenue, which reversed the assessor and granted the exemption to all but two of the taxpayer's ten property sites in Multnomah County. The Department agreed with the assessor that the remaining two sites, the Metropolitan Fitness Center and the Commonwealth Fitness Center, did not meet the statutory requirements for exemption. The Department explained:

"[T]he two fitness centers are not operated in a charitable manner because of their policies to serve only a small segment of the community, their pricing structure, and the minimal element of giving.

"* * * * *

"The real and personal property of the Commonwealth and Metropolitan Fitness Centers shall be assessed beginning only with the 1985-86 tax year."

YMCA-CW appealed to the Tax Court, which affirmed the Department's denial of exemption for these two properties. 11 OTR 101 (1988).

The Tax Court recounted that a family membership cost $525.00 to join plus yearly dues of $720.00 at the Metropolitan Center and $175.00 to join plus yearly dues of $480.00 at the Commonwealth Center. For 1986, the Tax Court found that, at Metropolitan, only five percent of the 4,400 members

were given either partial or full financial aid to defray the cost of their use of the facilities and that, at Commonwealth, 11 out of approximately 145 members received such aid in 1986. Total revenue at Metropolitan for that year was $2,408,530. Metropolitan valued the scholarships granted there at $95,419 for that year. The Tax Court denied the exemption claimed for these two facilities because the element of gift or giving in the use of the facilities was insufficient to meet the statutory criteria.

Commonwealth is in leased space at 421 S. W. Sixth Avenue in Portland and the exemption claim covers only personal property valued at $660 for 1985-86. Metropolitan is a 68,600 square foot, three-level concrete structure costing $4,300,000 when built in 1977 and valued at $5,225,000 for 1985-86. It is located in Portland at 2831 SW Barbur Blvd., near Terwilliger Blvd. The Tax Court noted that the last census reported 2,063 families in the area nearby Metropolitan, 15 percent of whom had incomes of less than $7,500. The census reported 10,248 children between the ages of 5 and 15 within three miles of the Metropolitan branch. The Tax Court agreed that YMCA-CW's selection of activities to be conducted at Metropolitan and Commonwealth which focus on meeting the needs of working adults in Portland's downtown area makes economic sense. However, the Tax Court decided that "such policy, however, does not constitute charity as the sole or primary object of the organization." YMCA-CW appeals to this court from the Tax Court's denial of tax exemption for the two branch properties.

YMCA-CW is a non-profit corporation operating in the greater Portland metropolitan area. Although it is affiliated with and contributes a percentage of income to the National Council of YMCAs headquartered in Chicago, YMCA-CW is operated by an autonomous local board. Its facilities in Multnomah County are operated as separate branches, each influenced by branch boards but ultimately accountable to YMCA-CW.

In this case, the question is not whether the YMCA, as an organization, is charitable. No doubts need be raised about the generally charitable nature of the YMCA nationally, in Oregon, or in metropolitan Portland in order to decide whether specific real or personal property is employed in a manner which qualifies for exemption from property

taxes. The question is whether the real and personal property at the Metropolitan branch and the personal property at the Commonwealth branch are "actually and exclusively occupied or used in * * * charitable * * * work carried on by such institutions." We affirm the Tax Court's decision.

### A. *"Charitable" Need Not Be Defined By Rule.*

■　　　　YMCA-CW makes an administrative law contention which, if well taken, would end the case without any need to consider its other claims. It contends that the Department could make no ruling to "deny" its exemption because the Department failed to adopt a rule defining "charitable" before YMCA-CW appealed to the Department. YMCA-CW contends that term "charitable" expresses non-complete legislation and constitutes a delegation of legislative authority to the Department. If that were correct, a rule would be needed before applying the term to a case. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 230, 621 P2d 547 (1980); *Megdal v. Board of Dental Examiners,* 288 Or 293, 605 P2d 273 (1980).

One difficulty with applying that claim to this case is that the county assessor made the decision to place the properties on the tax roll, not the Department. The assessor is assigned responsibility for granting or denying the exemption claim. ORS 307.162 and 311.207 to 311.213. After the assessor placed the ten properties on the roll, the taxpayer, YMCA-CW, appealed to the Department under ORS 305.275. The Department overruled the assessor by granting the exemption to YMCA-CW's property at eight other sites in Multnomah County and agreed with the assessor only about the property at two of the ten sites. If the Department could not act on an exemption claim absent a rule, the assessor's denial of the exemption for all ten sites would stand. In any event, in 1986 the Department adopted a rule which was effective prior to its 1988 final order denying exemption to properties at the two branch sites.[1]

---

[1] Relevant portions of the rule are:

"(1) The following criteria shall be used in determining the qualification for property tax exemption under ORS 307.130 * * *:

"(a) Applicant must be an incorporated charitable institution. * * *

"(b) The activity conducted by the incorporated charitable institution must be

Moreover, the contention that a rule defining "charitable" was a condition precedent to the Department's exercise of authority to determine an exemption claim is not supported by the history of the exemption statute or the fact of this court's interpretation and application of the statute to exemption claims over many years.

In 1854, Oregon's territorial legislature exempted various kinds of property from taxation by an act which was continued as law after statehood in 1859 by operation of Article XVIII, section 7, of the state constitution. That legislation in pertinent part, provided:

"The following property shall be exempt from taxation:

"* * * * *

"3. The personal property of all literary, benevolent, charitable and scientific institutions, incorporated within this state, and such *real estate belonging to such institutions* as shall be *actually occupied for the purposes* for which they were incorporated." General Laws of Oregon, ch 53, § 4, p 894 (Deady 1845-1864) (emphasis added).

This portion of the exemption provision remained intact for

---

for the direct good or benefit of the public. Public benefits must be the primary purpose rather than a by-product. Self serving organizations that benefit a small group or class of persons do not qualify as a direct charity.

"(c) An important consideration shall be whether the activity of the incorporated charitable institution in some way lessens the normal burdens of government.

"(d) A degree of gift or giving must be present in the activity conducted by the organization. If no gift is involved, there is no charity.

"(e) The property shall be actually used or occupied for the benevolent and charitable work carried on by the organization.

"(f) The use of the property must be consistent with the charitable purpose and goal of the organization.

"(g) There must be an actual charitable use of the property rather than just a charitable use of the income derived from the operation of the property. 'Destination of income' theory does not qualify for exemption.

"(h) The organization's articles of incorporation must require that its assets be used for charitable purposes when the organization dissolves.

"* * * * *

"(3) Recognition by the Internal Revenue Service of an organization as nonprofit and income tax exempt is not determinative of that organization's status for property tax.

"(4) Only the portion of a property used for * * * charitable * * * purposes shall be granted exemption from ad valorem taxation under this provision. Property may be in part taxable and exempt (*sic*)." OAR 150-307.130-(A) (December 31, 1986).

101 years, until the 1955 legislature amended ORS 307.130 to read, in pertinent part, as follows:

"(1)  Upon compliance with ORS 307.170, the following property owned by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a)  Except as provided in ORS 740.080, only such real or personal property, or proportion thereof, as is actually *and exclusively* occupied *or used* in the literary, benevolent, charitable or scientific work carried on by such institutions." Or Laws 1955, ch 576, § 1(a) (emphasis added).

In 1959, this court commented as follows on the effect of the added words "exclusively" and "used":

"The fundamental change made in ORS 307.130 by the act of 1955 * * * was to establish a new test for the determination of the right to tax exemption. By the act of 1955, such property 'or portion thereof, as is actually and exclusively occupied or used' became the cardinal criterion for the purposes of tax exemption.

"In short, before the 1955 amendment, the right to tax exemption turned upon *actual occupation* for the purposes of the institution. But after the amendment, the test to be thereafter applied was: whether the property was *actually and exclusively occupied or used* for such purposes."

*Mult. School of Bible v. Mult. Co.*, 218 Or 19, 26, 343 P2d 893 (1959) (citation omitted). In that case, this court examined the decisions in other jurisdictions and concluded:

"[T]he words 'exclusively occupied or used,' as employed in ORS 307.130, as amended, refer to the primary purpose for which the institution was organized and includes any property of the institution used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment and fulfillment of the generally recognized functions of such a charitable institution." 218 Or at 36-37.

This court has construed the exemption statute many times over the years. *See, e.g., YMCA v. Dept. of Rev.,* 268 Or 633, 635, 522 P2d 464 (1974); *Friendsview Manor v. Tax Com.,* 247 Or 94, 420 P2d 77 (1966), *rehearing allowed and former opinion adhered to,* 247 Or 127, 427 P2d 417 (1967); *Methodist Homes v. Tax Com.,* 226 Or 298, 308, 360 P2d 293 (1961); *Kappa Gamma Rho v. Marion County,* 130 Or 165, 176, 279 P 555 (1929); *Willamette University v. Knight,* 35 Or 33, 56 P 124

(1899). Judicial construction of the exemption statute, and its long use, contradict any perceived need for definitions by rule.

Even if there were no history of construction and use, we would not agree that the ORS 307.130(1)(a) is an example of delegative legislation requiring an agency to adopt a "legislative"[2] rule to complete its meaning before it may be applied to an individual case decision. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 228-30, 621 P2d 547 (1980). No rule was required.

### B. *The 1987 Legislative Amendments to ORS 307.130 Do Not Apply to YMCA-CW's Contentions.*

YMCA-CW claims that the amendments to ORS 307.130 by Oregon Laws 1987, chapter 391, section 1, properly interpreted, grant them their exemption. They do not. The amendments provide that an exemption shall not be denied an organization for either of the two following specified reasons: "solely because its primary source of funding is from one or more governmental entities" or because the organization's purpose "or use of the property is not limited to relieving pain, alleviating disease or removing constraints." ORS 307.130(2), 307.130(3). Neither of these changes in the statute are pertinently related to the reasons which YMCA-CW urges in seeking a charitable property tax exemption at Metropolitan and Commonwealth. Neither amendment relates to the deficiencies, in the aspect of giving, by which YMCA-CW lost its exemption for these properties.

YMCA-CW asserts that the 1987 amendments were the legislature's response to the decision in *Oregon Country Fair v. Dept. of Rev.,* 10 OTR 200 (1986). They also assert that the legislature overturned a part of that decision. We agree with both assertions. But it tells against YMCA-CW's claim for exemption here that the legislature, after specifically considering *Country Fair,* made no amendments changing the effect of the portion of that decision which states:

> "The second part of the meaning of charitable entails the element of a gift or giving. Charity is not just feeding the

---

[2] YMCA-CW is aware of Department's rule effective in 1986 but point out that this is an "interpretive" rule by its own words. Thus, they assert that the legislation-completing rule, which they contend is a necessity before agency action, does not yet exist.

hungry, clothing the naked or nursing the sick. Many businesses do just that and profit handsomely. In order to be charitable, it is essential that such conduct involve a degree of giving." *Oregon Country Fair v. Dept. of Rev.,* 10 OTR 200, 204 (1986).

### C. *The Required Giving Is Absent.*

■    YMCA-CW next contends that it has carried its burden of proving that its operations at Metropolitan and Commonwealth branch YMCAs are charitable. The contention is primarily based on facts, and argument from those facts, rather than on law. The facts relied upon are that the publications of the branch YMCAs invariably offer opportunities to use the facilities of that operation for free or on a sliding-scale of fees. Because anyone who asks and who is in need can be permitted to use the facilities, YMCA-CW argues that the entire operation should be exempt from real property taxation.

The Department responds that both the statute and its regulations require giving, that offering to give is not giving under the meaning of "charitable" in the exemption statute, and that other aspects of the membership operation, such as the relatively high annual membership fee, preclude a finding that the operation overall is charitable in the sense of giving.

As this court has stated:

"[T]he mere fact that an organization is either a hospital or a charity does not establish any inherent right to exemption. * * * Any organization claiming the benefit of the tax exemption statute as a 'charitable' institution must have charity as its primary, if not sole, object, and must be performing in a manner that furthers that object." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.,* 301 Or 423, 427, 723 P2d 320 (1986) (citations omitted).

This court has also held that good intentions and willingness to act on them are not enough. "Unselfish declarations of intended purpose and promises of future worthy endeavor are many times rendered meaningless by inaction and should give the declarer no preferred status unless ultimately resolved into concrete and tangible reality." *Methodist Homes, Inc. v. Tax Com.,* 226 Or 298, 308, 360 P2d 293 (1961).

The actual relationship of scholarship giving,

$95,419, to income in 1986, $2,408,530, is less than four percent; the relationship of paying members to partial or full scholarship members is five percent at Metropolitan and less than eight percent at Commonwealth. In its argument to us, YMCA-CW seeks to increase giving-to-revenue percentage by asking that we add to the value of the scholarships the value of volunteer work done for the Metropolitan branch by its members and friends.

This court's prior related decisions foreclose this argument. "[I]n order for the activities of a taxpayer to entitle him to exemption as 'social welfare' work they must be calculated to benefit some other group than the one which supplies the money and directs its disposition." *Ore. Physicians' Serv. v. State Tax Com.*, 220 Or 487, 506, 349 P2d 831 (1960). "Benevolent societies * * * are societies organized with the dominant purpose of doing good to others rather than for the convenience of their members." *Kappa Gamma Rho v. Marion County,* 130 Or 165, 176, 279 P 555 (1929). The benefits must extend beyond a group of individuals providing for themselves. *Friendsview Manor v. Tax Com.,* 247 Or 94, 100, 427 P2d 417 (1967).

YMCA-CW further asserts that the value of members' work performing maintenance at Metropolitan and the value of the doctors' and nurses' services provided to the cardiac exercise therapy program should also be included in assessing the degree of giving at Metropolitan. However, in exchange for the medical and maintenance work, Metropolitan provides membership benefits and monthly-dues rebates to the doctors, nurses and others. They are "paid" for their services in the form of use of Metropolitan's facilities. This barter transaction may increase the monthly cost to other members somewhat, but it does not represent an increased level of giving to the general public.

We hold that, in determining the degree of charity provided, giving *to* the Metropolitan branch does not qualify as giving *by* the branch.

## D. *Use of Each Specific Property Must Be Charitable.*

■     YMCA-CW next contends that the charitable-giving question should be decided by looking to the degree of giving averaged over all ten of its Multnomah County operations or over all its operations within the four-county greater Portland area. Even after averaging, the proportion of giving to gross revenues is not particularly high. But, assuming without deciding that this averaging device would produce a sufficient level of giving to establish that the overall work of YMCA-CW is charitable within the statutory meaning of that word, the property tax exemption statute which we apply in this appeal does not permit that averaging. Reference to the statute, and to this court's decisions construing it, demonstrate that each specific property claimed exempt must separately qualify as exempt.

The statute grants an exemption to "only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used" in charitable work. ORS 307.130(1)(a). The statutes also require that a verified claim be filed before "any real property may be exempted from taxation." ORS 307.162.

Our cases explain that charitable use of a part of the property of an exempt organization or institution does not qualify its remaining property, not so used, for exemption, even if the income from the non-exempt property is used to support the organization's charitable purpose. *YMCA v. Dept. of Rev.,* 268 Or 633, 639, 522 P2d 464 (1974) (portion of building used for barber shop and tailor shop); *Mult. School of Bible v. Mult. Co.,* 218 Or 19, 40-42, 343 P2d 893 (1959) (retail book supply store several miles from school's campus); *Willamette University v. Knight,* 35 Or 33, 46, 56 P 124 (1899) (part of campus leased to others for a nursery); *Hibernian Benevolent Society v. Kelly,* 29 Or 173, 193, 42 P 3 (1895) (portion of charity's main office building rented to others). *Cf. Waller v. Lane County,* 155 Or 160, 63 P2d 214 (1936) (property of charitable hospital after date of bank's purchase at foreclosure sale).

### E. *No Governmental Duty Is Relieved by the Two Fitness Centers.*

■ YMCA-CW next contends that physical development facilities such as weight room, track and basketball courts, as well as its monitored exercise program for cardiac patients relieve the government of the cost of providing such facilities, thereby entitling the fitness facilities to tax exemption.[3] Testimony of a retired director of the City's Park and Recreation Bureau was presented by the taxpayer. The city operates a running track at Duniway Park, next to the Metropolitan branch but has no other fitness center activities there. The taxpayer elicited further testimony of the retired park's director by the following questions and answers:

"Q. Sure. What, if anything, helped fill the public demand for health, physical education, and recreation facilities and programs for the period 1985, '86?

"A. I'd have to say that the nonprofit and profit agencies that were providing activities in this particular area.

---

[3] When a specific real property parcel is exempted from real property taxes the effect is to shift the amount of taxes it would have paid on to other parcels which are not exempt. The non-exempt property picks up a portion of the cost of local services which the exempt property would otherwise have paid. In Oregon this is not an inconsequential shift, although the degree of shift may vary substantially among different taxing districts or authorities. Over 50 percent of all real property within Oregon's boundaries is not subject to real property taxation. Federal, state, education districts and local government, religious, literary, scientific, and some health care and fraternal institutions are non-taxable. Exemptions for charitable institutions are sometimes thought to have been legislatively granted on the theory that the charity performed has sufficient value to the community overall to justify this shift of tax cost to that community. Resort to this "consideration rationale" to explain why legislatures grant charitable tax exemptions does not establish that eligibility for exemption is automatic whenever giving by the charity equals or exceeds the dollar amount of taxes sought to be avoided in a given year. Were it otherwise, a golf course or a racetrack, for example, could establish high greens fees or admission prices but then reduce the price enough for a large enough number of users to equal property taxes for the year and thus claim eligibility for charitable property tax exemption. The statute and the Department's regulations spell out circumstances where it is legally deemed that the cost to the remaining community is justified by the charitable work in fact performed.

The Department's regulations at OAR 150-307.130(A)(1)(c) appears to go further than the decisions of this court by requiring a *quid pro quo* to government itself, rather than to the general public. "[F]ailure to relieve a government burden is not a mark against such an organization." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.,* 301 Or 423, 431, 723 P2d 320 (1986).

An organization may do what government does and be charitable. It may do something which government does not and still be charitable. Conversely, doing what government does, absent "giving" in the exclusive occupation and use of a property, does not quality as charitable use of the property.

"Q.  Do the not-for-profits and the for-profits charge participation fees and fees to defray their costs and expenses?

"A.  Yes."

This testimony is in terms of filling a "public demand," not relieving a burden which the government has assumed and is carrying because it has a legal duty to do so. The testimony also demonstrates that no element of giving or altruistic acts are required to fill a public demand. The city may provide food and shelter for transients who are poor. A hotel also satisfies a traveler's demand for meals and a place to sleep, but for a price. One act is charity, the other is commerce or business.

Taxpayer also offered the testimony of an elected official that, apparently, local government would be petitioned by citizens to provide more athletic facilities if the various "Y" facilities throughout the city and county were not available. But no evidence of an accepted governmental duty or law imposing an enforceable burden was offered or cited. When asked "why" the city provides basketball courts, swimming pools, tennis courts, golf courses, running tracks, volleyball courts, weight and exercise rooms and racquetball courts, the official replied:

"In the — City charter, we are charged with providing for the health and welfare of the community and so we're very interested in having healthy citizens and we also consider the Park and Recreation Services to be a basic service of government * * *."

The relevant charter provision, to which the official referred, is:

"(a)  Among such specific powers, the City has power and authority:

"1.  To exercise within the City and City-owned property, all the powers commonly known as the police power * * *.

"2.  To secure the protection of persons and property and to provide for the health, cleanliness, ornament, peace, safety and good order of the City." Art. I, § 2-105(a), Charter of City of Portland (1985).

That a city has the charter authority or the power to care for

the health of its citizens does not in and of itself legally establish a duty or enforceable burden upon the city to do so. On the law, no duty was established so no governmental burden was relieved. On the facts, there is no evidence that the city has ever picked up or carried a burden in the downtown area which taxpayer's activities now relieve. The contention fails for lack of a necessary-fact predicate.[4]

Besides, no authority has been cited to us that, where relief of the governmental burden is not accompanied by substantial giving to the needy, relieving the government's burden will none-the-less supply the required element of charitable giving. *Dove Lewis, supra,* 301 Or at 431 does categorize relief of a governmental burden as an "indicator" of giving but held that "the evidence simply does not establish that the taxpayer relieves the county of any appreciable burden" and that the court was not convinced the county "would feel required to offer similar services" if the taxpayer stopped offering them.

The *Dove Lewis* court cited *Friendsview Manor v. Tax Com., supra,* and *Methodist Book Concern v. St. Tax Com'n,* 186 Or 585, 597, 208 P2d 319 (1949), in discussing the role of relief of a governmental burden in a property tax exemption claim. In *Friendsview Manor v. Tax Com., supra,* 247 Or at 105-06, this court assumed that providing housing for the indigent aged was a governmental burden, but denied the exemption because the member-residents of Friendsview Manor "are largely persons who can fend for themselves, either collectively or individually, and the government would not be required to provide housing for them."

In *Methodist Book Concern v. St. Tax Com'n, supra,* the element of relieving a governmental burden was not discussed in terms of tending to supply the required element of giving. That case held that a former exemption statute[5] which granted exemptions to domestic corporations while denying them to similar foreign corporations, did not give constitutional offense. The classification was a reasonable one, in the

---

[4] We do not reach the question of the effect, if any, upon an exemption claim resulting from the fact that private, for-profit businesses offer the same services as are provided by the charitable corporation.

[5] Compiled as OCLA § 110-201 (1949.)

court's opinion, because the legislature could exercise power over how the domestic corporation carried out its charitable purposes but could not similarly control or influence the use of net proceeds taken out of state by a foreign corporation. 186 Or at 607-08. Thus, there was no assurance that any charitable conduct of the foreign corporation would benefit people within Oregon or elsewhere. The lack of assured giving justified denial of the exemption.

### F. *1985 is the "Current Assessment Year" In This Case.*

■       YMCA-CW contends that Oregon Laws 1987, chapter 391, section 2, prevents taxation of its property for the 1985-1986 tax year. The contention turns on the meaning of "current assessment year" in the amendment. The Department asserts that it means 1985; YMCA-CW contends it means 1988, the year in which the director of that Department issued the order upholding the Multnomah County Assessor's denial of exemption on the two properties. We agree with the Department.

The amendment created an exception to the statute controlling placement of omitted property on the assessment rolls. The amendment treats the term "current assessment year" as meaning the year in which the property was added to the assessment roll or the tax roll. The assessor placed the properties on the rolls as assessable and taxable during 1985. No change of that fact has since occurred.

The tax exemption claim is denied. The decision of the Tax Court denying property tax exemption is affirmed.