

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN, TEXAS 78711

WAGGONER CARR
ATTORNEY GENERAL

May 31, 1966

Mr. Joe Resweber
County Attorney
Harris County
Houston, Texas

Opinion No. C- 697

Re: Whether Clarewood House,
an elderly persons'
retirement home, is exempt
from ad valorem taxes as
an institution of purely
public charity.

Dear Mr. Resweber:

In connection with your request for an opinion on the above captioned matter, we have been advised of the following facts. Clarewood House, hereinafter referred to as the Home, is owned by the Sharpstown Tower Corporation, which is incorporated under the Texas Non-Profit Corporation Act for the charitable or benevolent purposes of providing elderly persons with housing facilities and were specially designed to meet the physical, social, and psychological needs of the aged and contribute to their health, security, happiness, and usefulness in longer living. The corporation is 100% financed as an F.H.A Loan Project. The Commissioner of Internal Revenue has heretofore granted this corporation a tax exemption as having been organized and operated exclusively for charitable purposes and no part of the earnings of which inures to the benefit of any private shareholder or individual. See Sec. 501(c)(3) of the Internal Revenue Code of 1954, 26 U.S.C. Sec. 501 (c)(3); also annotations in 69 A.L R.2d 871, 878.

The corporation's property consists of 8.388 acres of land located in a metropolitan area of Houston, adjacent to the large Sharpstown Shopping Center. The Home was located to avoid isolation from the community and designed to meet the needs of elderly citizens for adequate housing in that community, costing $4,700,000.00. It has eleven stories, containing two hundred eighty-eight apartment residence units, each having its own private bath with tub or tub-shower combination. There are no steps in the Home; only elevators and inclines which have handrails are provided, with some units having side door ovens and baths for wheel-chair residents. A specially designed nursing care unit is connected to the

-3352-

Home by covered passageways and ramps. Included in the unit are rooms for occupational therapeutic activity of several kinds and rooms for residents requiring nursing care by resident nurses. A twenty-four nursing unit is provided at rates which the residents can afford to pay and at a rate well-below the prevailing rates in Houston. A furnished chapel and various recreational areas are available to all without cost. Much of the cost of operating the Home is to be paid for by contributions or donations, which now exceed $450,000.00. No founder's or finder's or admission fee is charged, but those residents who are financially able to pay for their care are charged a fee on a basis determined by the Board of Directors. Admission in each case is determined on its own merits and as a matter of mutual agreement. Hotel-type room and bath, with 288 square feet normally bring a fee of $80.00 monthly; efficiency units of 354 square feet for $100.00 monthly; the one-bedroom, living dining combination, with kitchen, electric range, and more elaborate facilities for $150.00 monthly; two-bedroom, two-bath apartments, extensive facilities and containing 780 square feet for $190.00 monthly, ten of which are specially designed for wheel-chair tenants. Additional elaborate facilities include a library, game room, beauty shop, restaurant, hobby rooms, auditorium for lectures and cultural events, telephone and message service, coin-operated laundry, and sun decks. All apartments are air-conditioned with a picture-window view, and have tile flooring. When it becomes debt-free, the land and buildings are required to be deeded to the First Methodist Church.

Fifteen units in the Home have so far been set aside for use by retired persons unable to pay for such facilities, three of which are occupied by tenants paying no rental and six of which are occupied by tenants paying only partial rental. Thus nine of the 288 apartment units have been occupied by tenants who are unable to pay the normal rental charges, and at this time, an additional six patrons unable to pay are being added as tenants. The Board of Directors assert they are increasing the number of full and partial charity tenants just as fast as resources permit! Revenues have not been sufficient to pay the debt charges and all operating expenses and over $450,000.00 in deficits have had to be raised by donations. Although it was a group of individuals who organized the Home, it is non-sectarian, with most denominations represented by tenants. The average age of the 275 residents is 77. Sixty per cent of them receive Social Security benefits, sixty-five per cent being under 72; and one-third of the residents would face serious

difficulty without the social security. All are unemployed but five. The Board of Directors have avoided requiring information smacking of a "pauper's oath" or disclosure of their amount of income; but in all cases it ascertains that the aged persons are "needy" and it is satisfied that no recipient of charity is a property owner. Our rough calculation indicates that an average apartment unit costs approximately $16,000.00 to erect.

On the basis of the information furnished to us in a letter of the Vice President and General Manager, we compute the following data relevant to apartments which have been in use on a charitable or part-paid basis, as follows:

| | |
|---|---|
| Total of the usual monthly rental | $1,250.00 |
| Total monthly rental charged and collected | 465.00 |
| Amount commuted per month as charity | $ 785.00 |

When we multiply this $785.00 per month by 12, we arrive at the sum of $9,420.00 which represents part of the charity contributed by Clarewood House during a year's period of time. Under conditions at the date of this writing, it is anticipated that more than $18,000.00 will be represented as charity for this tax year.

In addition, it is fair to state that charity is also present not only from the Home paying the entire or partial costs for some of the residents but also charity is present with respect to all of the aged residents who are furnished services and facilities at a rate substantially less than cost. We have not attempted to convert this charity into dollars, but it appears that the charity to the public resulting from the operation of the Home is substantial and not merely nominal, as the revenues have not been sufficient to pay debt charges and operating expenses and over $450,000.00 in deficits have had to be raised by donations.

The Home claims exemption from ad valorem taxes under Article VIII, Section 2 of the Constitution of Texas, which provides that ". . . the legislature may, by general laws, exempt from taxation . . . institutions of purely public charity; and all laws exempting property from taxation other than the property above mentioned shall be null and void."

The Legislature, in Article 7150, Section 7, V.C.S. of Texas, provided:

> "Public charities. All buildings and per-
> sonal property belonging to institutions
> of purely public charity, together with
> the lands belonging to and occupied by
> such institutions not leased or otherwise
> used with a view to profit, unless such
> rents and profits and all moneys and credits
> are appropriated by such institutions solely
> to sustain such institutions and for the
> benefit of the sick and disabled members
> and their families and the burial of the
> same, or for the maintenance of persons
> when unable to provide for themselves,
> whether such persons are members of such
> institution or not. An institution of
> purely public charity under this article
> is one which dispenses its aid to its
> members and others in sickness or distress,
> or at death, without regard to poverty or
> riches of the recipient, also when the funds,
> property and assets of such institutions are
> placed and bound by its law to relieve, aid
> and administer in any way to the relief of
> its members when in want, sickness and dis-
> tress, and provide homes for its helpless
> and dependent members and to educate and
> maintain the orphans of its deceased members
> or other persons."

In interpreting the phrase "purely public charity" in our Constitution, Article VIII, Section 2, the word "purely" in the Constitutional provision above quoted modifies the word "charity" and not the word "public" so as to require an insti- tution to have a wholly altruistic quality and exclude from it every private or selfish interest or profit or corporate gain. Benevolent & Protective Order of Elks v. City of Houston, 44 S.W.2d 488, 493 (Tex.Civ.App. 1931, error ref.).

The property of the institution must be used wholly and exclusively for charitable purposes and such use of the property must be actual, direct, and exclusive. City of Houston v. Scottish Rite Benevolent Assn., 111 Tex. 191, 230 S.W. 978 (1921). It cannot be used to engage in a commercial business. Dickison v. Woodmen of the World Life Ins. Society, 280 S.W.2d 315 (Tex. Civ.App. 1955, error ref.). Nor may it be used to enter into a landlord and tenant relationship which creates a commercial transaction or lease, particularly where rent is paid. David Graham Hall Foundation v. Highland Park I. S. Dist., 371 S.W.2d 762 (Tex.Civ.App. 1963, error ref., n.r.e.). Even where actual rent is not paid such non-charitable use destroys the exemption.

City of Longview v. Markham - McRee Memorial Hospital, 152 S.W.2d 1112 (Tex.Comm.App. 1941); Santa Rosa Infirmary v. City of San Antonio, 259 S.W. 926 (Tex. Sup. Ct. 1924). However, our courts in these cases have clearly indicated that charitable institutions might derive, as an incident of the administration of the charities, rents and profits where they were devoted directly and solely to those very charities. Moreover, as pointed out in the Santa Rosa Infirmary case, supra, where all facilities are exclusively operated by members of the institution, tax exemption is not lost by the needy patron capable of paying, doing so, for maintenance or for services rendered therein by others not wholly engaged in a charitable work. Nor did the operation of a small drug store in the building destroy the tax exempt structure. The requirement is merely that the buildings be used and occupied by the charitable institution and none other.

It is pertinent to observe that such a charitable institution as an infirmary need not be supported exclusively by gratuities or donations to be exempt from taxation, since it was held in the Santa Rosa Infirmary case, supra, that it does not lose its exempt status by paying for its plant from incidental earnings or expending its funds realized therefrom in training nurses, being within the proper upkeep and maintenance needs, for which profits may be appropriated. 7 Baylor Law Rev. 494, 497.

From the above authorities, it is also seen that ownership as well as exclusive use by the charitable institution is required in the sense of a perpetual dedication of the property and the miscellaneous mutations of profits derived to charitable uses or purposes. No private individual may obtain any profit or gain, or if a corporate owner is involved, no distributable earnings, such as dividends, may result. In addition, the institution must benefit persons indefinite in numbers and personalities, to the end that they will be prevented from becoming burdens to society or to the State. City of Palestine v. Missouri-Pacific Lines Hospital Ass'n., 99 S.W.2d 311 (Tex. Civ.App. 1936, error ref.)

On the other hand, the authorities above cited hold that the charity is not required to be universal to be public and the institution is not required to search out the needy persons on the highways and byways. Raymondville Memorial Hospital v. State, 253 S.W.2d 1012 (Tex.Civ.App. 1952, error ref., n.r.e.); II Baylor Law Rev. 133, 138. The charity is deemed public if it affects all of the people of a state or community through

its assumption, to a material extent, that which otherwise might become the obligation or duty of the state or community. If lawful, the charity is not necessarily rendered "private" as distinguished from "public" because limited in sect, class or fraternal order, etc. 11 Baylor Law Rev. 137. It is said "charity need not be universal to be public." City of Palestine v. Missouri-Pacific Lines Hospital Ass'n., supra; B.P.O.E. Lodge v. City of Houston, 44 S.W.2d 488 (Tex.Civ.App. 1931, error ref.).

The latest definition and test of charity, as interpreted by the Supreme Court of Texas, is set out in River Oaks Garden Club v. City of Houston, 370 S.W.2d 851 (1963). In a five to four decision, the Court applied the so-called "quid pro quo" idea earlier expressed in City of Houston v. Scottish Rite Benevolent Ass'n., supra, wherein it was said that a charitable institution must meet three criteria to warrant tax exemption: (1) it must make no gain or profit, (2) must accomplish ends wholly benevolent, and (3) must benefit persons indefinite in number by preventing them from becoming burdens on the community or state. 18 Southwestern Law Journal 703, 707-708.

It affirmatively appears from the River Oaks Garden Club case, supra, that first, in order to justify a charitable tax exemption, the institution's activity itself must be one in which the state or community could have an obligation to support; and secondly, the institution must substantially tend to lessen that obligation so that the benefits therefrom run to a relatively large segment of the public. Further, it cautions us that a charter declaration of the purpose and obligations is not conclusive, and we must look further to the actual operations of the institution and the effect and result thereof. No guidelines are provided as to just what activities are to be deemed to be government obligations or just what degree, or percentage or extent of charitable benefits must be provided to warrant an exemption. Institutions, though plainly altruistic, will apparently not be held to be purely charitable which do not provide provable benefits covering a substantial number of people in those areas falling within the traditional definition of public welfare. Examples are institutions devoted to the promotion of the fine arts of gardening, dramatics, interior decorating, maintenance of historical landmarks, or those arts characterized as "aesthetic", as evidenced in the River Oaks Garden Club case, supra. It is left to the function of our courts to determine where the line will be drawn and to provide other examples.

The problem of applying the rule of River Oaks, supra, to the facts of this or other situations is accurately described in 18 Southwestern Law Journal 703, 711 (1964):

> "Even if the courts interpret the quid pro quo standard liberally, the uncertainty which pervades the criteria for charitable exemptions in Texas will work a hardship on institutions in the fringe area. In most cases one should be able to look to the constitution and the exempting statutes to determine whether a particular organization qualifies for exemption. The present law, however, is so encumbered with small distinctions concerning exclusive use, the activities considered charitable, and the extent to which the public must be benefited that, except in extreme cases, it is impossible to determine exemption status without the court's help. It is hoped that this morass will be clarified when the court again is confronted with a charitable exemption case." (Emphasis ours)

It is our considered opinion that, assuming an absence of controversy as to the particular facts submitted, the Home may not be said to fall within the "fringe area." While the courts have failed to state what they regard as sufficient charitable benefit running to the public, they have said that if it was shown to be "substantial," the charitable exemption could be established. Based upon the facts submitted to us, it is our opinion that the substantial benefit test has been met. What is adequate housing for the needy aged? According to our governmental current standards of society by 1961, adequate housing "means housing which the aged can afford, which meets the special physical needs of the aged, and which is designed to avoid isolation from the rest of the community or an institutionalized feeling." (White House Conference on Aging Policy Statement on Housing, January 11, 1961). According to the Policy Statements and Recommendations of the White House Conference on Aging, February, 1961, the average person can now expect to live longer than before - past seventy and into the eighty bracket - and will have longer periods of retirement. We now have five times more people over sixty-five than we had in 1900; the number will double in the next forty years, while the number over seventy-five will triple. In Harris County, Texas, the problem is the same and within the next four years, there will be 108,600 people over sixty-five. The harsh social

and economic facts revealed in the Conference Report show that such a "retired citizen  is one who by reason of age has ceased to work his customary intensity of employment.  He may or may not engage in other types of part-time occupation. . . .  His regular normal earned income, however, has in fact ceased."

The problem  of adequate housing and care for the aged is being undertaken as an obligation by all echelons of government.  Drugs and medical care have extended life; the industrial revolution and population explosion have combined to bring an ever increasing higher standard and quality into the lives of even the poor and needy.  What is now "decent" and "reasonable" housing and care for the aged was, indeed, luxury when the framers wrote our State Constitution over one hundred years ago.  Since the introduction of the common law into this State in 1840, the Texas Constitutions have been framed with reference to it, and our Constitution is required to be interpreted in the light of the development of the common law as declared by the courts of the Country.  Ex Parte King, 35 Tex. 658 (1871); Dickson v. Strickland, 114 Tex. 176, 265 S.W. 1012 (1924); Trimmier v. Carlton, 116 Tex. 572, 591, 296 S.W. 1070 (1927).

The Supreme Court of Texas will apply words in the Constitution to present-day conditions and may find words "to have been therein used in a sense broad enough to include things not then within human experience or knowledge." Koy v. Schneider, 110 Tex. 369, 221 S.W. 880, 918 (1920).  Since the Supreme Court in River Oaks Garden Club v. City of Houston, supra, has said that the framers of our Constitutions intended the meaning of the charitable exemption to cover "that which otherwise might become the obligation or duty of the community or the state" (370 S.W.2d 854, r. c.), it is therefore necessary to observe what obligations the government has undertaken and how the courts of the country have interpreted purely public charity in the light of the common law.  In addition, our Constitution, Art. III, Sec. 51a, authorizes certain expenditures for needy aged persons, and the Legislature, in Articles 695c, 675j, 1524b through 1524k, 1528a, 1269k has provided extensively for the care and housing of the aged.  We do not read into these governmental obligations an intent to exclude tax exemption for charitable activities to be undertaken by the citizens themselves.  The state government claims no monopoly on charity.

The obligation or duty of government under its general welfare powers is as narrow or broad as the customs, mores, ethics, standards, and social conscience of its people at a

particular time. There could therefore be no fixed, unchanging, and inflexible meaning of what constitutes "charity," nor do we think the constitutional framers intended to write into the Constitution a particular standard or social concept of their time. The concepts of "general welfare" and "charity" are not static. Needs that were narrow or parochial a century ago are interwoven in our day with the well-being of the community and state.

The White House Conference of 1961 established the principle and objective that "All aging people . . . should be adequately housed in a suitable neighborhood of their choice and supplied with community facilities and services at rents they can afford. There is, and will continue to be, a need for an increase in all types of housing . . . . The aged have special needs as to both their housing and their total environment. Integral parts of their problem on the planning and developing of facilities for the aged - such as transportation, shopping, medical and hospital facilities, utilities, churches, cultured outlets and congenial neighbors." All of these things the Home in this case sought to provide in a purported charitable way.

We have heretofore rendered Opinion Numbers WW-771 (1960), WW-1277 (1962), WW-1318 (1962), WW-1424 (1962), C-209 (1964), and Opinion No. C-357 (1964), in which we recognized that homes for the aged, under the facts submitted, were institutions of purely public charity and involved that which otherwise might become the obligation or duty of the community or state within the legal concepts set out in River Oaks Garden Club v. City of Houston, supra. This is in accordance with the common law meaning of purely public charity in other jurisdictions and we still adhere to it. 84 C.J.S. 610, Taxation, Sec. 296, and p. 417, Sec. 2; Topeka Presbyterian Manor, Inc. v. Board of County Com'rs., 195 Kan. 90, 402 P.2d 802 (1965); American-Russian Aid Ass'n. v. City of Glen Cove, 246 N.Y.S.2d 123 (1964); Fifield Manor v. County of Los Angeles, 10 Cal. Rptr. 242, 188 Cal.App.2d 1 (1961); Fredericka Home for the Aged v. San Diego County, 35 Cal.2d 789, 221 P.2d 68 (1950); 69 A.L.R.2d 871, 944, Secs. 33 and 34; Delm Housing Corp. v. Finnegan, 85 F.Supp. 220 (D.C. Mo. 1949); Scofield v. Rio Farms, Inc., 205 F.2d 68 (C.A. 5 Tex. 1953), affg. 104 F.Supp. 515.

The authorities throughout the nation are generally in accord in upholding this legal concept, as so clearly set out in Fifield Manor v. County of Los Angeles, supra, 10 Cal.Rptr. at p. 249:

". . . Relief of poverty is not a condition
of charitable assistance. If the benefit con-
ferred has a sufficiently widespread social
value, a charitable purpose exists. It is a
matter of common knowledge that aged people
require care and attention apart from financial
assistance, and the supply of this care and
attention is as much a charitable and benevo-
lent purpose as the relief of their financial
wants. Every civilized community must provide
facilities, either public or private, for the
care of old people regardless of financial
condition. . . .

". . . 'The concept of charity is not con-
fined to the relief of the needy and destitute,
for "aged people require care and attention
apart from financial assistance, and the supply
of this care and attention is as much a charita-
ble and benevolent purpose as the relief of
their financial wants!" So the charge of fees
by such an institution as a home for the aged
will not necessarily prevent its classification
as charitable if such sums "go to pay the ex-
penses of operations and not to the profit of
the founders or shareholders," for all persons
may "under certain conditions be proper subjects
of charity." . . . In short, as the word "charity"
is commonly understood in modern usage, it does
not refer only to aid to the poor and destitute
and exclude all humanitarian activities, though
rendered at cost or less, which are maintained
to care for the physical and mental well-being
of the recipients, and which make it less
likely that such recipients will become burdens
on society."

In _Oregon Methodist Homes, Inc. v. Horn_, 226 Ore. 298,
360 P.2d 293, 298 (1960), the court also recognized the
applicability of the above authorities, and that such homes
for the aged could be an exempt charitable institution,
likening them in analogy to the charitable tests applied to
hospitals, but denied the exemption upon the ground that the
facts revealed the lack of any charter provision for a contin-
uation of charitable works when the assets were disposed of in
the event of corporate dissolution. Other determining factors
considered to be relevant in the determination, besides the
charter purposes and by-law provisions, were the application

or use of receipts; whether patrons received the same treatment
irrespective of ability to pay; whether the doors of the home
were open to the poor as well as the rich and without other
discrimination; whether charges were made to all patrons and
whether any charges were made to the indigent; whether a chari-
table trust fund was created; and whether if the home had no
operational gains, there were offsetting advantages.

The Court in Haines v. St. Petersburg Methodist Home, Inc.,
173 So.2d 176 (Fla. 1965), recognized that providing homes for
the aged was a proper charitable purpose, but denied the
exemption upon a showing that the facilities were not available
to the general public, many applicants were not accepted unless
they are able to pay, and the charter failed to disclose what
would happen to its assets in the event of corporate dissolution.

In the case of Clarewood House, we assume the facts to be
true that sufficient applicants not able to pay are accepted
by the Board of Directors under the circumstances.

The Ohio Supreme Court, in The Philada Home Fund v. Board
of Tax Appeals, 214 N.E.2d 431 (1966), and the Nebraska Supreme
Court, in County of Douglas v. O.E.A. Senior Citizens, Inc.,
172 Neb. 696, 707, 111 N.W.2d 719, 725 (1961), denied a charitable
exemption to the institution whose purpose was merely "the furnish-
ing of low cost housing at its real cost." This activity the
courts said did not in itself fall within the meaning of "charity,"
declaring that "the reason for exemption is present benefit to
the general public sufficient to justify the loss of tax revenue."
The institutions were unable to show clearly sufficient facts to
satisfy this test. In the County of Douglas case, supra, although
it was shown that the Internal Revenue Service and the Treasury
Department had ruled that the institution was owned and operated
exclusively for charitable purposes, the Court nevertheless held
to the contrary, saying:

> "The design and purposes of the building
> on the land was to furnish housing to
> selected people at low cost. There is
> nothing to indicate that it was to be below
> the cost of the service furnished. . . .
> In fact no right to remain in occupancy other
> than at the will of the defendant was a declared
> purpose except as to a limited class of occupants.
> . . ." (111 N.W.2d 725).

In the case of Clarewood House, we are advised by the facts submitted that the main purpose and use is not the mere furnishing of relatively low-cost housing to selected people but that charity is the purpose, and the right to remain in occupancy is not at the will of the Board. The mere lack of a church sponsor does not prevent the Home from having a charitable exemption. Apparently the federal government is satisfied with its exclusive charitable purpose and use and saw fit to finance it one hundred per cent and give it an exemption from taxes on the ground that it was organized and operated as exclusively charitable.

We find no substantial or material distinctions to be made on the facts herein related as to Clarewood House as compared to those related in our previous opinions. In Opinion C-357, supra, for example, involving Bayou Manor, sponsored by the Brazos Presbyterian Church, there was no more charitable benefit running to the public for its operation than is shown in the Clarewood case.

In writing this opinion, we have attempted to set out such legal guidelines as exist on the question presented for the benefit of any other interested parties faced with a similar question. We hasten to point out, however, that we have assumed that no factual controversy exists between the taxing authority and the party seeking the exemption. In issuing official opinions, this office is not authorized to resolve disputed factual issues. Our opinions are based solely upon the application of legal principles to the facts submitted to us. If a taxing authority and a party seeking a tax exemption are not in agreement as to the evidential facts upon which a claim for exemption is based, the parties must resolve their dispute in a court of law that is authorized to resolve disputed fact issues. B.P.O.E. Lodge v. City of Houston, supra; Raymondville Memorial Hospital v. State, supra; Benevolent & Protective Order of Elks v. City of Houston, 44 S.W.2d 488 (Tex.Civ.App. 1931, error ref.); City of Houston v. Scottish Rite Benevolent Ass'n., supra; 7 Baylor Law Rev. 498 and 11 Baylor Law Rev. 148. This is particularly true, as stated by the cited authorities, because the burden of clear proof is on the one claiming exemption; exemptions from taxation are never favored; and all doubts are resolved against the exemption and in favor of the taxing power.

### S U M M A R Y

The Attorney General's office is not authorized to pass on fact questions. However, under the facts submitted, which we assume as true and uncontroversial,

Clarewood House is deemed to be an institution of purely public charity which would be entitled to exemption from ad valorem taxes under Article VIII, Section 2 of the Texas Constitution.

Yours very truly,

WAGGONER CARR
Attorney General of Texas

By Kerns B. Taylor
Kerns B. Taylor
Assistant

KBT/fb

APPROVED:

OPINION COMMITTEE
W. V. Geppert, Chairman
Pat Bailey
Robert Flowers
Roger Tyler
J. C. Davis

APPROVED FOR THE ATTORNEY GENERAL
BY: T. B. Wright