## OREGON STAMP SOCIETY *v.* STATE TAX COMMISSION

George L. Wagner, Portland, tried the case for plaintiff. On the brief were Koerner, Young, McColloch & Dezendorf and George L. Wagner, Portland.

Gerald F. Bartz, Assistant Attorney General, Salem, tried the case and submitted a brief for defendant.

Decision for defendant rendered February 21, 1963.

Peter M. Gunnar, Judge.

This is a suit to set aside defendant's opinion and order No. VL 62–87, denying to plaintiff an exemption duly claimed by it under ORS 307.130 from ad valorem property taxes for the tax year 1961–62 with respect to its real property in Portland, Multnomah County.

## EVIDENCE

Plaintiff is a nonprofit corporation and was originally organized in 1916 as an unincorporated association under the name Beaver Stamp Society. It was incorporated as a nonprofit corporation in 1945 under its present name and with its purpose, as stated in its articles, being

> "* * * to further and advance the science of philately and to provide facilities for stamp collecting among its members and to do everything necessary and proper to promote the general purposes of the organization."

At first the society met in members' homes and when the membership became larger in public halls, primarily the Portland YMCA. In 1960, the Society purchased from the City of Portland a vacant fire station, the property here at issue. They then repaired and remodeled it, expanding greatly their meeting, library, and laboratory facilities. Since 1960, this property has been used by the Society and its members, and has been rented to other groups for $10 a day about four times a month.

In the building, sometimes called "Stamp House," the plaintiff maintains the Pacific Northwest's largest library on philately, about 500 books, and an efficient laboratory for the analysis and classification of philatelic materials. These facilities are used primarily by the Society members, though the public also is welcome.

The Society meets three times a month at Stamp House and various of its study sections meet there at other times also. The Society now has a membership of 300, and the meetings usually are attended by about 70.

The expenses of the Society are paid from its dues and from income from various projects. The dues are the primary income (40%), with auctions and rentals being the other substantial sources. The rentals bring in about $400 annually and the auctions net over $500 a year in commissions. These auctions are of stamps and covers and cater to the public as well as the membership. To some extent they compete with regular dealer sales.

In addition to its membership activities, the plaintiff holds public courses on philately to interest people in the subject, conducts educational courses in the schools, operates a therapy program at the VA hospital, helps youth organizations such as Scouts, and

participates in television programs. All this activity is designed to interest and assist others in philately.

Much of the testimony centered upon the activities of the postal history section of the Society. This section, made up of 12 of the 300 Society members, is engaged in an exhaustive study of the postal history of the Oregon Territory to 1886. From the testimony it is clear that this section is making a valuable contribution to the history and historical study of this region. Because of the efforts of this section, the plaintiff and the Oregon Historical Society are each an associate member of the other.

On cross-examination primarily, it was brought out that stamp collections frequently have substantial value, that most members join the Society to help in their collecting activity, that the laboratory helps protect collectors against forgery, and that most people undertake philately as a hobby, for recreation or relaxation, as a "stress-breaker." In defense of their Society, the plaintiff's witnesses stressed their goal of making more collectors become serious students of philatelic and related subjects. They encourage their members to publish research and have an editorial board to help them. They pointed to a Ph.D. degree recently given in Public Administration by American University in Washington, D.C., where the subject of the thesis was the administrative aspects of this country's postage stamp program, as being recognition of the literary and scientific standing of philately. Actually, while the thesis had some connection with philately, its title imports greater emphasis on the problems of public administration.

The evidence in this case results in the following conclusions: The Oregon Stamp Society is a nonprofit

corporation of some 300 members who are interested in the collecting of stamps and related items. Their interest in stamps varies and a few of them are sufficiently studious to engage in independent research of some historical and scientific value. The members are associated together to provide a meeting of those interested in philately, to provide library and research facilities for common use, and to conduct auction, trading, and other activities. Together they perform certain public service functions, particularly those directed toward public information and the encouragement of philately. The Society owns and operates the subject property for these purposes.

## ISSUES

The issues in this case, as agreed upon by counsel and set forth in the pretrial order, are:

1. Is philately *per se* such an activity that an association devoted to its promotion is a literary or scientific institution?

2. If philately is not such an activity, do the activities of the Oregon Stamp Society constitute it a literary or scientific institution?

3. If the Oregon Stamp Society is a literary or scientific institution, is its property actually and exclusively used as required by ORS 307.130(1)?

## DEFINING STATUTORY EXEMPTION

The words of ORS 307.130 under which the plaintiff claims exemption and which grant an ad valorem property tax exemption to "literary, benevolent, charitable and scientific institutions" have long been part of our statutory scheme of exemption. First enacted in 1854,

they have remained determinative of the basic property tax exemptions throughout our history. Yet strangely, perhaps, they have not experienced any exhaustive judicial definition but rather have scarcely drawn more than a passing reference, except in the definitions contained in *Kappa Gamma Rho v. Marion County*, 130 Or 165, 279 P 555 (1929) and in *Behnke-Walker v. Multnomah County*, 173 Or 510, 146 P2d 614 (1944).

■■ The *Kappa Gamma Rho* case, involving the exemption of a college fraternity house, turned upon the definitions of both "literary" and "scientific" institutions. In that case, the court distinguished between students and "men of letters." (130 Or at 175):

"* * * Its members are attending that institution [Willamette University]. They are attending as students, not as philanthropic men of letters or scientists. * * *"

Later (130 Or at 176), the court said:

"* * * The literary work [of the fraternity members] is that of a student while attending college. The scientific phase of the plaintiff's activities is that of a student while preparing himself for his life's vocation. Such pursuits are not generally classified as literary or scientific. * * * Literary societies are organizations for the propagation and spread of good literature rather than for one's own individual education. Scientific societies are usually and ordinarily understood to embrace organizations for the promotion of science or the pursuit of scientific studies for the purpose of developing science, rather than as a student in a college or university for his own edification."

The *Behnke-Walker* case, involving the exemption of a business college operated for profit, held that, by reason of the juxtaposition of "benevolent and chari-

table" with "literary and scientific," they are to read as a whole, as an associated phrase, requiring the literary and scientific institutions to be also charitable to be exempt.

The definitions in these two cases are much more useful in defining the meaning of the statutory terms than the extremely broad, dictionary definitions cited by counsel, but they obviously are neither precise nor all inclusive. Instead they are oriented to the particular facts before the court and provide only a part of the design of this general exemption statute.

The activity of the plaintiff, philately, ordinarily is undertaken as a hobby or for relaxation but in its more advanced or esoteric forms, it includes research using the methods and tools of science, a systemization of its material, the production of instructive literature, and a contribution through a few of its members to the advancement of recognized fields of knowledge. It also attempts to propagate and promote participation, advocacy, study, and research in its field of activity. In many respects its activity as a whole conforms to the broad, dictionary definitions of literary and scientific and appears to fall within the quoted definitions in the *Kappa Gamma Rho* case, *supra.*

Yet in the light of the pervasiveness of modern science and the proclivity of modern man for the assembling, systemizing, and recording of data, it is hard to visualize an organization (other than a fraternal living organization of students), regardless of how frivolous, which could not qualify for exemption, so long as it remained substantially nonprofit within the rule of *Behnke-Walker v. Multnomah County, supra.* A sportsmen's club, with lectures on animals (zoology), the promotion of fish and game management and study

(taught at colleges), and similar activities could be exempt. A television watching club could contribute to the arts. A match folder collecting club could contribute to product design, fire prevention, etc. This is the absurd result against which we are warned in *Allen v. Multnomah County,* 179 Or 548, 555, 173 P2d 475 (1946). Obviously, the mere participation in activities which, of themselves, could be, and regularly are, classified as literary and scientific cannot be the criterion of exemption. This is implied from the language of *Kappa Gamma Rho v. Marion County, supra.* The literary or scientific activity must to some extent, as yet undefined, be so fundamental to the organization's activity that it is to some degree inherently literary or scientific.

## NATURE OF EXEMPT CHARACTER

■ The determination of the nature of the exempt character necessary to qualify for exemption requires interpretation of the broad language of the statute. The purpose of the inquiry is to determine the legislative intent in its enactment. In so doing, we are not bound by the broad, literal meaning of the words used, if the legislative intent can be discerned. *Allen v. Multnomah County, supra* (179 Or at 554). Furthermore, the legislative intent to exempt must be clear beyond a reasonable doubt. *Behnke-Walker v. Multnomah County, supra* (173 Or at 521).

### *Rules of Interpretation*

■■ The basic rules for such interpretation are established. Exemption statutes are to be strictly construed against the exemption. The rationale of strict construction lies in the nature of taxation as an essential attribute of sovereignty and the effect of exemp-

tion as a dimunition or surrender of that sovereignty. *Staiger v. Holman,* 144 Or 67, 77, 23 P2d 917 (1933). However, such strict construction should not and "does not foreclose the application of a reasonable construction in order to ascertain the legislative intent." *Multnomah School of the Bible v. Multnomah County,* 218 Or 19, 27, 343 P2d 893 (1959). In the words of Mr. Justice Cardozo, exemption statutes "are not to be so grudgingly read as to thwart the purposes of the lawmakers." *Trotter v. Tennessee,* 290 US 354, 356, 54 S Ct 138, 78 L ed 358, 360 (1933). Yet, as this court has pointed out in *First Evangelical United Brethren Church v. Commission,* OTC No. 10 (1962), the "reasonable" corollary does not require the construction to encompass all reasonable constructions. Rather, it merely requires the construction adopted to be reasonable. Furthermore, an exemption only will be found where the language will admit no reasonable construction denying the exemption. *Ballou v. Fisher,* 154 Or 548, 553, 61 P2d 423 (1936).

■ If the construction is to be strict, but not so strict as to thwart the legislative purpose, the primary inquiry must go behind the statutory language to the purpose and policy it serves. *Allen v. Multnomah County, supra* (179 Or at 554). Why are literary and scientific institutions exempt? As noted earlier, the instant exemption was first enacted by the territorial legislature in 1854. Except to change the word "territory" to "state," it remained unchanged until 1945. A discussion of the intent of the territorial legislature is found in *Behnke-Walker v. Multnomah County, supra* (173 Or at 513 et seq.). In 1945 the language was re-enacted. In that re-enactment is imbedded the Oregon decisions to that date and the general theories of exemptions prevailing in this country. These theories are

set forth with clarity and force in a number of United States Supreme Court decisions.

## Consideration Rationale

■ "Exemptions from the operation of a tax always create inequalities. Those not exempted must, in the end, bear an additional burden or pay more than their share." *Pollock v. Farmers Loan & Trust Co.*, 157 US 429, 595, 15 S Ct 673, 39 L ed 759 (1895). "Strong considerations of fiscal and social policy view tax exemptions with a hostile eye." Mr. Justice Murphy dissenting in part in *Oklahoma Tax Comm. v. United States*, 319 US 598, 612, 63 S Ct 1284, 87 L ed 1612 (1943). Therefore, a "grant of exemption is never to be considered as a mere gratuity—a simple gift from the legislature. * * * A consideration is presumed to exist. The recipient of the exemption may be supposed to be doing part of the work which the state would otherwise be under an obligation to do." *Illinois Central Railroad Company v. City of Decatur*, 147 US 190, 201, 13 S Ct 293, 37 L ed 132, 135-136 (1893) (educational); *St. Ann's Asylum v. New Orleans*, 15 Otto (105 US) 362, 368, 26 L ed 1128 (1882) (charitable hospital). Thus, the granting of an exemption is a matter of policy, not of power, *Piqua Branch v. Knoop*, 16 How (57 US) 369, 384, 14 L ed 977 (1853); and that policy generally is to grant a tax exemption in consideration of the exempt taxpayer relieving "the State from a burden which would involve a much larger amount of taxation than that which it waives by granting the exemption." *St. Ann's Asylum v. New Orleans, supra.*

■ Though this rationale for exemptions is not as clearly stated in the Oregon authorities, it lies easily

discoverable in, and beneath the surface of, both the court's decisions and the acts of the legislature. *Willamette University v. Knight,* 35 Or 33, 56 P 124 (1899). The Oregon court has recognized that "all property should be required to bear its proportionate share of the public burdens." *Allen v. Multnomah County, supra* (179 Or at 552). "The only property, public or private, in fact exempted is such as 'has been sequestered or devoted to public uses.'" *Behnke-Walker v. Multnomah County, supra* (173 Or at 520). The Oregon cases require a substantial basis for differentiation and require the basic concepts of charity.

In the statutory scheme of exemptions, ORS 307.130 is the basic statute, the one which expresses the "consideration" rationale. Certainly, the legislature has the power to depart from this "consideration" rationale and has done so. The power to exempt is the concomitant of the power to tax. *City of Eugene v. Keeney,* 134 Or 393, 397, 293 P 924 (1930). It is part of the sovereignty of the state. *Staiger v. Holman,* 144 Or 67, 77, 23 P2d 917 (1933). It is an expression of public policy. *City of Eugene v. Keeney, supra.* But each time that this sovereign power has expressed such public policy and consideration cannot be found in the exempt organization providing public services at reduced cost to the taxpayer, the legislature has enacted a specific statute, thereby taking the exemption out of the consideration rationale. See ORS 307.134 re: fraternal and veterans organizations. So long as the consideration for the exemption exists, the court supports the exemption under the general terms of ORS 307.130; but when, as in *Kappa Gamma Rho v. Marion County, supra,* the court failed to find consideration, call it what one will, the exemption must be

founded upon a further expression of legislative grace. See ORS 307.136.

■ Thus, going behind the general words of the statute to the purpose and policy which it was the intent of the legislature to serve, it reasonably can be determined that the general literary and scientific exemptions of ORS 307.130 are restricted to those institutions which engage, on a charitable basis, in a literary or scientific activity which relieves the state of a burden which would involve a much larger amount of taxation than would be waived by the exemption. Such interpretation is not so restrictive as to thwart the reasonable intent of the legislature and conforms to the basic theories of exemptions and the reasonable interpretation of the rationale of our court's decisions. Furthermore, it conforms to the legislative practice of special enactments of the lawmakers' exemptive grace when the consideration rationale cannot be found.

## BURDEN OF PROOF

■ The plaintiff here relies, as it must, upon the general terms of ORS 307.130 and, therefore, on the consideration rationale. It has the burden of proving its exempt status as a literary or scientific institution by a preponderance of the evidence. *Oregon Methodist Homes, Inc. v. State Tax Commission,* 226 Or 298, 307, 360 P2d 293 (1961). By that preponderance it must prove that it is a literary or scientific institution which is exempt under the foregoing definition. In amassing such preponderance, it is faced with the evidentiary presumption to the contrary arising out of the assessment by the assessor. *Strawn v. Commission,* 1 OTR 98, 148 et seq. (1962).

## EXTENT OF EXEMPT CHARACTER

To meet this burden the taxpayer adduced extensive testimony concerning the historical research and the forgery detection activities of the Society. These activities might reasonably be said to promote the public interest. However, the testimony showed rather clearly that only a few of the 300 members engaged in these activities, far too few and far too little in the quantity of activity to justify the maintenance of Stamp House. In addition, some of the members conduct avocational programs in the schools and at the Veterans Hospital. While all these activities are most commendable, they do not bear any direct relationship to plaintiff's principal function or to the principal utility of the property claimed to be exempt.

Instead, the record here shows that the principal function of the plaintiff was and is to encourage and promote the hobby of philately, stamp collecting, that the vast majority of its members are collectors and no more, that its historical, scientific, charitable, or benevolent activities are merely incidental to its primary function as a hobbyist society, and that it fulfills no function which, but for the Society, would fall as a burden upon the state.

The plaintiff's reliance on these incidental activities raises the question of the extent of the exempt activity required to characterize it as a literary or scientific institution. As pointed out earlier, almost every group activity in our society could qualify to some extent under the broad terms of "scientific" or "literary" as defined in *Kappa Gamma Rho v. Marion County, supra*. Certainly anyone familiar with college fraternities recognizes that in some of their activities they propagate and spread good literature and promote

the study of science. Yet the fraternity was denied an exemption. This denial is rationalized, as it was by Mr. Chief Justice Coshow, because the principal function and purpose of the fraternity was the providing of a fraternal living unit, not that of a benevolent or charitable, literary or scientific institution. Thus, in applying the consideration rationale to exemptions it is not the incidental or minor activities of the claimant which control, but rather the principal activity, the main function which in fact it serves. See *Oregon Physicians Service v. State Tax Commission,* 220 Or 487, 506, 349 P2d 831 (1960). If this main function, this principal activity, relieves the state of a literary, benevolent, charitable or scientific burden which the state would otherwise be under an obligation to bear and which would involve a much larger amount of taxation than would be waived by the exemption, and if this principal literary or scientific activity is performed on a charitable basis for the benefit of others and not primarily for the benefit of its own members then, the exempt character required of the institution under ORS 307.130 exists. *Oregon Physicians Service v. State Tax Commission, supra* (220 Or 507); *Kappa Gamma Rho v. Marion County, supra.*

■ The requirement of an exempt principal activity follows logically because the consideration rationale cannot be said to apply to an incidental or minor function. The burden of which the state is relieved by an incidental activity is not sufficiently great to be *quid pro quo* for the revenue forgiven. When the activity claimed as exempt is not a principal function, it cannot, as a matter of law, be said to relieve a burden involving a much larger amount of taxation than the taxation excused by the exemption because the value of the activity in terms of the state's burden and the part

of the excused taxation allocable to the exempt activity are too speculative for judicial construction. Additional pronouncements of legislative grace would be required.

Furthermore, when the exempt activity is incidental to a nonexempt principal purpose, the institution no longer comes within the definition of "scientific" or "literary." ORS 307.130 does not grant exemptions to institutions engaged in scientific or literary activities. Rather it restricts them to "scientific" or "literary" institutions. The reasonable construction of the statutory words requires that the scientific or literary activities be so much a part of the institution as to determine its character. Incidental or minor activities do not do so. It is only the principal activities of an institution which can be said to characterize it as a scientific or literary institution, and only those so characterized by such primary or principal function are exempt under ORS 307.130.

The court has not ignored the authorities cited in the case so favorably presented and so well argued by the plaintiff's counsel. Principal among them were two New York cases, *Collectors Club v. Boyland,* 309 NY 917, 131 NE 914 (1955) and *People v. Tax Commissioners, City of New York,* 96 NYS2d 36 (1950). The former was directly in point and in it the court sustained the exemption of a stamp collectors' club as, *inter alia,* scientific. The latter sustained the exemption of a farm operated by a religious group. To the extent that they are in point, and certainly the *Collectors Club* case is, this court declines to be persuaded. It does so because, as it interprets them, the above-cited and other Oregon cases evince the judicial purpose of honoring the rationale of consideration and

apply a stricter construction than the very liberal construction applied in New York. It also is mindful of the court's admonition in the *Kappa Gamma Rho v. Marion County, supra,* to apply foreign precedent with caution. Furthermore, in view of the *Kappa Gamma Rho* case, which today may warrant reconsideration as to its result in the light of current conditions and the consideration theory, a fixed adherence to the consideration rationale rather than broad dictionary definition appears most consistent with the general Oregon approach to exemptions. *Allen v. Multnomah County, supra.*

■ In summation, then, this court finds that a literary or scientific institution to be exempt under ORS 307.130 must be a nonprofit, charitable institution performing a literary or scientific activity which relieves the state of a burden which would involve a much larger amount of taxation than would be waived by the exemption and that such literary or scientific activity must be a primary function of the institution, not merely an activity incidental to a primary activity or purpose which is basically what Mr. Justice ROSSMAN called "a self-regarding purpose" in *Oregon Physicians Service v. State Tax Commission, supra* (220 Or 507). It finds that philately is the hobby of collecting and studying postage stamps and related material. It finds that philately is not such a literary or scientific activity that its continuance would be a burden to be assumed by the state, if the plaintiff did not exist. It finds that among the members of the plaintiff there are a few who devote time to activities which are literary or scientific within the framework of ORS 307.130 but that this activity is merely incidental to the "self-regarding purpose" of the plaintiff as an associ-

ation of hobbyists and is not sufficient to characterize the plaintiff as a literary or scientific institution. Therefore, it finds that plaintiff is not a scientific or literary institution and is not exempt under ORS 307.130. It finds also that Stamp House is used by the plaintiff in its activities as a hobbyist organization and is not used actually and exclusively, or otherwise than incidentally, for a purpose which is literary or scientific within the meaning of ORS 307.130.

A decree will be entered herein under rule 31, dismissing the plaintiff's complaint herein. In view of the "borderline" nature of the denial as described by the assessor and the lack of precedent in this area, costs will not be allowed.