IN THE OREGON TAX COURT

THEATRE WEST OF LINCOLN CITY, LTD.,
an Oregon nonprofit corporation
*v.*
DEPARTMENT OF REVENUE
(TC 3317)

James C. Griggs, Saalfeld Griggs Gorsuch Alexander & Emerick, P.C., Salem, represented plaintiff.

Ted E. Barbera, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered July 20, 1993.

**CARL N. BYERS, Judge.**

Plaintiff is an Oregon nonprofit corporation engaged in live theatre productions in Lincoln City. Plaintiff applied for property tax exemption for the 1990-91 tax year. The assessor denied the exemption and plaintiff appealed to defendant. After a hearing, defendant also denied plaintiff's claim and plaintiff appealed to this court.

**ISSUES**

The issues are: (1) Is plaintiff a literary organization; and (2) is producing live theatre a charitable purpose?

## FACTS

Typical of local theatre groups, plaintiff is staffed by amateur performers, crafts people, helpers and hang-arounds. Its auditions are open to the public. Although its heart is the small core of dedicated and passionate people who love theatre, producing live plays requires many people and a variety of talents. Plaintiff's members and friends design and construct sets, create costumes, apply makeup, operate lights and stage, select the cast, conduct rehearsals, perform music, publicize the production and administer the business.

Plaintiff has successfully garnered community support and provides significant benefits in return. In addition to its regular performances, it provides benefit performances for organizations such as the hospital auxiliary, the city library and a women's crisis center.

Plaintiff averages approximately ten benefit performances per year. Beneficiary organizations sell the tickets at higher than plaintiff's normal prices. Plaintiff donates the use of the production script, its people and facilities, all of which involve out-of-pocket expenses. Plaintiff performs other community services such as conducting classes for acting and theatre production. It provides drama assistance to the local schools. The school drama groups use plaintiff's facilities and supplies without charge.

Plaintiff provides some tickets free to those who want to see a performance but cannot afford it. The number of free tickets given out depends in part on how popular a production is. If the production is popular, there will be fewer tickets given away. The number of tickets given away also varies with the number of people who happen to be in need. Determining who receives a free ticket is left to the artistic director's judgment.

On the whole, plaintiff contributes significantly to the community, both in money and services. It also contributes to the local economy by attracting tourists.

## THE STATUTE

ORS 307.130(1)(a)[1] provides:

---

[1] All citations to the Oregon Revised Statutes and to the Oregon Administrative Rules are to the 1989 Replacement Part.

"(1) Upon compliance with ORS 307.162, the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(a) [O]nly such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

Plaintiff applied for exemption as a literary organization. In discussing the relationship between the words "literary" and "charitable," as used in the statute, the Oregon Supreme Court in *Behnke-Walker v. Multnomah County*, 173 Or 510, 520, 146 P2d 614 (1944) held:

"Upon viewing that section in its entirety, it is apparent that the legislature did not intend to exempt from taxation private property used for private profit, and that the only property, public or private, in fact exempted is such as 'has been sequestered or devoted to public uses.' "[2]

Although the terms are read in conjunction with each other, they are not equivalent or identical. Unlike the terms "benevolent" and "charitable," which are synonymous,[3] "literary" and "scientific" have different meanings.

"Benevolent societies, as the term is used in the statute, are societies organized with the dominant purpose of doing good to others rather than for the convenience of their members. Literary societies are organizations for the propagation and spread of good literature rather than for one's own individual education. Scientific societies are usually and ordinarily understood to embrace organizations for the promotion of science or the pursuit of scientific studies for the purpose of developing science, rather than as a student in a college or

---

[2] In ascertaining the intent of the statute, *Behnke-Walker* referred to and quoted from *Board of Assessors v. Garland School of Home Making* to the effect:

" 'While the words "literary" and "scientific" show that the exemption given by the statute is not restricted to institutions having the narrow charitable purpose of relief of the poor or sick, they are to be interpreted, like the word "benevolent," in the light of their use in connection with the word "charitable" and do not extend the exemption to literary or scientific institutions which are not in the nature of public charities.' " 173 Or at 519 (quoting *Assessors of Boston v. Garland School*; 296 Mass 378, 385-86, 6 NE2d 374, 381 (1937)).

[3] *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 309, 360 P2d 293 (1961).

university for his own edification." *Kappa Gamma Rho v. Marion County*, 130 Or 165, 176, 279 P 555 (1929).

A charitable institution must have charity as its main or primary purpose, but a literary institution does not. A literary institution's primary purpose must relate to promoting literature. *See, for example, Black's Law Dictionary* 933 (6th ed 1990). By specifically providing an exemption for "literary" and "scientific" institutions, the legislature has determined those purposes are worthy of subsidy through tax exemption.

Although a literary institution does not have to be charitable in purpose, it must be charitable in nature. That is, it must be a nonprofit corporation whose assets are dedicated for public benefit; and must be open to all without discrimination on the basis of economic status, race or other criteria not related to the purposes of the institution. Further, the purpose of a literary institution must be to promote good literature for the benefit of the public generally rather than primarily for the satisfaction of its members. Institutions whose primary purpose is the pleasure of its members, whether as a hobby or otherwise, do not merit public tax subsidy. *See Oregon Stamp Society v. Commission*, 1 OTR 190 (1963).

It bears repeating that, although a literary institution must be for public benefit, its primary purpose need not be charity. If a literary institution had to be a charitable institution, the word "literary" in the statute would be meaningless. By specifying literary and scientific in addition to charitable, the legislature expressly extended a tax exemption to institutions whose primary purpose is not charitable.

## STRICT CONSTRUCTION

Before proceeding further, it is well to consider the judicial constraints surrounding the interpretation and application of exemption statutes. In Oregon, it has long been established that taxation is the rule and exemption from taxation is the exception. *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 360 P2d 293 (1961). Consequently, statutes exempting property from taxation are strictly construed.

"All tax deductions are a matter of legislative grace, to be strictly construed against the taxpayer. In fact, if there is even a doubt whether the legislature granted a deduction or

exemption, the presumption is that the legislature did not so provide and we have so held. 'No exemptions should be allowed, therefore, unless they are plainly warranted, and the intent of the legislature to exempt must be clear beyond a reasonable doubt. * * * An intention to exempt will not be implied from language which is susceptible of any other reasonable interpretation.' " *Unander v. Pasquill et al*, 212 Or 213, 223, 319 P2d 579 (1957) (citations omitted) (quoting *Allen v. Multnomah County*, 179 Or 548, 552-53, 173 P2d 475 (1946)) (citations omitted).

However, the rule of strict construction is secondary to the rule that the intent of the legislature controls. *Willamette Univ. v. Tax Com.*, 245 Or 342, 344, 422 P2d 260 (1966).

## LITERARY ORGANIZATION

No Oregon statute or rule defines literary. The statements in *Behnke-Walker* and *Kappa Gamma Rho* indicate that a literary institution is one which promotes good literature for the benefit of society. Applying the rule of strict construction, the court finds that plaintiff is not a literary institution. The term "literary" does not include movies, theatre, television or opera. The term "literary" refers to literature or written words. Plaintiff's purpose is not to promote good literature. Its purpose is broader. It may employ the written word, but it does so in speech or song, set in an artistically created background, costumed and accompanied by music. In the common and usual meaning of words, this is not the business of a literary society, but of a theatre.

## CHARITABLE INSTITUTION

Plaintiff also claims that it qualifies as a charitable institution without regard to whether it qualifies as a literary institution. To qualify as a charitable institution, plaintiff must meet three tests:

"(1) [T]he organization must have charity as its primary, if not sole, object; (2) the organization must be performing in a manner that furthers its charitable object; and (3) the organization's performance must involve a gift or giving." *SW Oregon Pub. Def. Services v. Dept. of Rev.*, 312 Or 82, 89, 817 P2d 1292 (1991).

This case raises the issue of whether producing live theatre is a charitable purpose. Before that question can be

answered, we must ask, what is charity? Traditionally, it has been defined as a gift.

> "[A] charity may be defined as a 'gift to be applied, consistently with existing law, for the benefit of an indefinite number of persons, * * * by relieving their bodies from disease, suffering, or constraint.' (Citation omitted.)"[4] *Benton Co. v. Allen et al*, 170 Or 481, 485, 133 P2d 991 (1943).

As expressed by this court in *Oregon Country Fair v. Dept. of Rev.*, 10 OTR 200, 204 (1986) (footnote omitted):

> "The word 'charitable' has a two-part meaning. The first part of the meaning, which deals with the nature of the act called 'charitable,' requires that the act be for the good or benefit of human beings. In a general sense, any conduct which tends to relieve suffering, uplift, enlighten, build or enhance people may be viewed as charitable. By contrast, the conducting of war, spreading of disease, or any other activity which tends to destroy or tear down cannot be viewed as charitable no matter how conducted.

> "The second part of the meaning of charitable entails the element of a gift or giving. Charity is not just feeding the hungry, clothing the naked or nursing the sick. Many businesses do just that and profit handsomely. In order to be charitable, it is essential that such conduct involve a degree of giving."

Property tax exemptions are not granted to gifts, but to organizations. There may be little question that a gift of money to fund free public performances of classical music is charitable. However, when an organization charges admission to a play or performance, where is the charity? Is it enough that the organization is nonprofit? If the organization gives away some tickets, does that make it charitable? If an organization gives away "some" tickets or services, how

---

[4] In *Pennoyer v. Wadhams*, 20 Or 274, 280, 25 P 720 (1891) (citation omitted), the court quoted a more comprehensive definition:

" 'A charity, in the legal sense, may be more fully defined as a gift to be applied consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, or by relieving their bodies from disease, suffering or constraint, or by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government.' "

much is enough to qualify as charitable? Giving by the organization of four to five percent may not be sufficient giving. *See YMCA v. Dept. of Rev.*, 308 Or 644, 784 P2d 1086 (1989).[5]

The fact that property tax exemptions are granted to organizations shifts the focus from a gift of property to the use of property, thereby changing the issues. This shift in focus blurs the concept of charity. To say that an organization must have charity as its primary purpose does not define charity. If the traditional definition of charity is used, the test would be whether the organization has giving for public benefit as its primary purpose. This is not very helpful. Does it imply that the organization must receive public donations? Few charitable organizations operate wholly on donations.

This change in focus has left the courts out of focus and uncertain as to what tests should apply. In *Methodist Homes, Inc. v. Tax Com.*, 226 Or at 309-10, the court formulated a checklist of characteristics or tests to be applied. However, the court noted:

> "We do not hold that all the foregoing factors must be present before a given institution can be declared one of charitable or noncharitable pursuits nor do we say that the list includes all items which may assist in a conclusion respecting the charitable or noncharitable status of a given corporation." *Id.* at 310.

The uncertainty, if not confusion, surrounding what constitutes a charity is widespread.

> "It is extraordinary that no generally accepted rationale exists for the multibillion dollar exemption from income and property taxes that is universally conferred on 'charitable' institutions. Due primarily to the vast array of activities to which the exemption has been applied, it has defied all past attempts to formulate a synthesizing concept of charitable."
> Hall and Colombo, *The Donative Theory of the Charitable Tax Exemption*, 52 Ohio St L J 1379, 1381 (1991) (footnote omitted).[6]

---

[5] In *Oregon Stamp Society v. Commission*, 1 OTR 190 (1963), this court found ORS 307.130 implies a requirement that the amount of giving must exceed the value of the tax subsidy received. However, this test has never been adopted by the Oregon Supreme Court.

[6] This article explores market considerations as well as the moral and tax considerations in proposing donations as the critical or basic test.

The uncertainty in Oregon increased in 1987. In *Oregon Country Fair*, this court found that the plaintiff's purpose was to "promote the arts and crafts, the exchange of ideas, the establishment of a community feeling of unity and enhance an earth-life harmony philosophy." 10 OTR at 205. While this purpose is commendable and worthwhile, the court held that it did not fall within the narrow definition of charity which involved "relieving pain, alleviating disease or removing constraints." *Id. See also Benton Co.*, 170 Or at 485.

In response, the 1987 legislature added subsection (3) to ORS 307.130.

> "(3)   An institution shall not be deprived of an exemption under this section because its purpose or the use of its property is not limited to relieving pain, alleviating disease or removing constraints." Or Laws 1987, ch 391, § 1.

It appears the legislature was concerned that the language used in *Oregon Country Fair* was too narrow and would result in the loss of existing exemptions. However, the legislature did not indicate whether it intended to overrule *Oregon Country Fair* and allow exemptions for arts and crafts fairs. *See, for example*, Hearings on HB 3018, Senate Comm on Rev and School Finance (May 26, 1987, and May 28, 1987).

Many of Oregon's property tax exemptions for charitable organizations are more a matter of tradition and history than legal analysis. Nevertheless, orphanages, boys' clubs and camps, young men and young women's associations, schools, universities, soup kitchens and hospitals have long been recognized as organizations with charitable purposes.[7]

There can also be little doubt that many newer organizations which seek to remedy the ills of society are

---

[7] Such organizations may lose their exemption if they fail to involve giving. *See, for example*, *YMCA v. Dept. of Rev.*, 308 Or 644, 784 P2d 1086 (1989). Also, some organizations may have little control over choices forced upon them.

"Historically, the uninsured have relied heavily on the largess of private hospitals for critical care. However, stringent reimbursement controls recently imposed by both private and governmental payors threaten to eliminate the ability of hospitals to cross-subsidize the care of the medically indigent from revenues generated by paying patients." Hall and Colombo, *The Charitable Status of Nonprofit Hospitals: Toward A Donative Theory of Tax Exemption*, 66 Wash L Rev 307, 315 (1991).

charitable in purpose. Women's crisis centers, drug and alcohol counseling, counseling and assistance for abused children, public defenders, cancer research, AIDS care, care for the mentally impaired, relief and help to victims of crimes, care for the mentally ill, and halfway houses for recently released prisoners are just a few examples of the many charitable services provided by a wide variety of organizations. Despite the variety of these organizations, all come within the traditional and narrow definition of charity. Consequently, it is not clear what activities the legislature intended to include as a result of adding ORS 307.130(3). Plaintiff seeks to have live theatre included within the definition of charity.

Theatre is only one branch of the world of art, which encompasses pictures, music, sculpture, theatre, and variations thereon. Is art charity? In the absence of legislative direction, the court believes it unreasonable to assume all art benefits society. As recent controversies demonstrate, some art displayed in a museum may be viewed as depraved and harmful to society.[8] Those who support symphonies may view heavy metal rock music as emanating from hell. However, heavy metal rock fans may have like views of classical music. If plaintiff's live theatre is charitable, is the obscene, neo-Nazi stand-up comic also charitable?

In inquiring as to whether art is charity, we must ask what is art? The aesthetic interests of our society are apparently limitless in scope. To name just a few, we have monster trucks, model railroads and experimental aircraft, clog dancing and woodcarvers, blue-glass collectibles and glass blowing, drag racers and dog shows, power lifting and cheerleading, drums, guns and civil war uniforms, war bonnets and arrowheads, barbed wire and satin cushions; the list is endless. All of these interests may be able to claim some merit as an art form and as a benefit to society.[9] In *Oregon*

---

[8] *See, for example,* McCombs, *Is It Art Or Is It Broccoli?*, Wash. Post, Nov. 1, 1991 at B1.

[9] The line between art and other activities often becomes blurred. Consider, for example:

"In our family, there was no clear line between religion and fly fishing."
Maclean, *A River Runs Through It* 1 (1976).

*Stamp Society v. Commission*, 1 OTR 190 (1963), this court held that a stamp collecting (philatelic) organization was not exempt as a literary, charitable institution.

Is the benefit to society from art viewed as "charitable" or "benevolent?" If plaintiff's theatre group performs "Murder in Mind" for senior citizens, and that is charitable, is it any less charitable to have monster trucks crush cars for the amusement of the mechanically enamored? Are all forms of entertainment forms of art? Certainly, movies, television, and the music industry are viewed as art. Is this true for sports entertainment such as basketball or sumo wrestling?

In summary, it is not clear what the legislature intended by the amendment to ORS 307.130. If the definition of charity is applied broadly enough to encompass art, the potential loss in tax base is enormous. Would the legislature assume all art forms are worthy of a tax subsidy? In view of the many types of art, this seems unlikely. If not, will it be necessary for the courts to determine which art forms benefit society and which do not? It seems highly unlikely that the legislature would intentionally impose such a duty on the courts.

One indicator of charity is whether the organization relieves the government of a burden.

> "The exact reason behind the government granting tax exemptions to charitable enterprises is not certain because of the hodgepodge of exemption statutes. However, the most reasonable explanation seems to be that the government exempts such organizations from paying taxes because if such enterprises did not exist the government would be required to use tax dollars to do the job the charitable enterprises are now doing." *Friendsview Manor v. Tax Com.*, 247 Or 94, 105-06, 420 P2d 77, 427 P2d 417 (1967).

Plaintiff receives grants from the Oregon Arts Commission, a government agency using tax money to promote

---

" 'Remember,' as my father kept saying, 'it is an art that is performed on a four-count rhythm between ten and two o'clock.'

"My father was very sure about certain matters pertaining to the universe. To him, all good things — trout as well as eternal salvation — come by grace and grace comes by art and art does not come easy." *Id.* at 8.

the arts. Inasmuch as government has determined to promote art,[10] does it relieve government of a burden if plaintiff produces plays? If plaintiff does not produce plays, the state would not be required to pay more. In *YMCA v. Dept. of Rev.*, 308 Or at 658, the court indicated that where the plaintiff failed to establish a governmental duty, "no governmental burden is relieved." Plaintiff has not shown that government has a duty to provide live theatre for its citizens. The court finds that plaintiff's activities do not relieve government of any burden.

Do plaintiff's members receive a profit, advantage or benefit? "[T]he gain, profit or private advantage derived need not be solely pecuniary." *Dove Lewis Mem. Emer. Vet. Clinic v. Dept. of Rev.*, 301 Or 423, 429, 723 P2d 320 (1986). Since all of the participants in plaintiff's activities, except one, are volunteers, any benefit derived from those activities must be other than pecuniary. Is the "smell of the grease paint and roar of the crowd" the type of benefit or advantage which indicates an activity may not be charitable?

OAR 150-307.130-(A)(3)(b) gives the example of a rifle club which undoubtedly could claim numerous benefits to society and could involve substantial giving. Yet, if the basic motivation for the existence of a rifle club is the pleasure of its members, it is not a charitable organization. The court finds that the primary purpose of plaintiff is not to benefit society but to benefit its members. Much of plaintiff's evidence of involvement with the community simply emphasizes the fact that there is no satisfaction for a performer without an audience.

## CONCLUSION

■     The court finds that producing live theatre is not a literary or a charitable purpose. That is not to say it is not a beneficial or valuable part of the community. Undoubtedly, plaintiff's activities are a great source of satisfaction and provide uplift and encouragement to many. However, plaintiff's primary purpose is to entertain, not to remedy the ills of or benefit society. The basic reason for plaintiff's existence is

---

[10] *See* ORS chapter 359. The objectives of the Oregon Arts Commission are set forth in ORS 359.030.

the satisfaction and pleasure its members derive from creating the illusory world of theatre.

Accordingly, defendant's Opinion and Order No. 90-3341 must be sustained. Defendant to recover its costs.