IN THE TAX COURT OF THE
STATE OF OREGON

OREGON WRITER'S COLONY
*v.*
DEPARTMENT OF REVENUE
(TC 3913)

Jay Urban, Urban & Urban, West Linn, represented plaintiff.

Joseph P. Dunne, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered December 3, 1996.

**CARL N. BYERS, Judge.**

Oregon Writer's Colony (OWC) appeals the denial of a property tax exemption under ORS 307.130. OWC claims it is a literary or charitable organization and uses the property exclusively to accomplish its exempt purposes.

## FACTS

In 1983, OWC was organized as an Oregon nonprofit corporation. Its articles of incorporation characterize it as a "nonprofit charitable association" whose exclusive purposes are "charitable, literary and educational" within the meaning of section 501(c)(3) of the Internal Revenue Code. The articles also provide that OWC's purpose is to purchase, furnish, maintain, and operate a permanent facility to house the corporation and to make it available to writers and artists without regard to race, creed, age, or sex. It appears that most of the articles of incorporation are intended to comply with the requirements for exemption from federal income tax.

OWC's bylaws state that it is a nonprofit corporation "representing and nurturing the professional and novice writer." The bylaws establish a membership organization open to any person who donates an amount at least equal to the annual membership fee, which was $25 during the subject year. The bylaws specify that the principal business office is in Portland, but the principal location for educational workshops and conferences is at the subject property in Rockaway Beach.

The subject property is an older residence which OWC purchased in 1988. It is used primarily as a writer's retreat, a place of quiet to get away and write. The pattern of use for the property is as follows: the first week of the month is for workshops, the second week for individual writers, the third week for critique groups and the fourth week for general use. Fees for use of the property vary from $100 per week for individual writers to $300 per week for general use. The record of use of the property for 1994 shows some empty periods. Otherwise, its use is consistent with the purposes and activities described above.

OWC schedules an annual open house and approximately eight workshops per year at the subject property. The workshops OWC sponsors are typically led by published authors. They cover various forms of writing including poetry, technical writing, fiction, and script writing. The workshops are open to the public, and OWC advertises the workshops in several newspapers and magazines. OWC

charges members and nonmembers a fee for the workshops to cover associated expenses.

OWC sponsors one workshop per year for young people. The cost of this workshop is mostly donated by OWC in the form of scholarships. Minimal fees are asked, primarily to motivate quality participation in the workshops. Many of the youth that participate in these workshops are disadvantaged or minorities. One such student testified that she had received a full scholarship and the workshop had benefitted her in her school work. During 1994, there was one workshop for minority high school students.

OWC has no paid staff and, therefore, has a rule that members must be present during use of the property. Those who use the property must furnish their own bedding, towels and food, and must clean up after themselves. Members voluntarily perform maintenance on the property. The fees imposed for use of the property are required to help pay the mortgage and related expenses. A letter from the president of the organization indicated fees are kept to a minimum to meet expenses, reasoning:

> "We want our members to be able to afford to use the house for their writing projects, or come to a workshop. The organization was formed to educate and support writers, period. We have no other goal."

## ISSUES

The issues are: (1) whether OWC qualifies for exemption from property taxes as a literary or charitable organization under ORS 307.130[1] and (2) if OWC qualifies, then is its property used exclusively to accomplish its exempt purposes?

## ANALYSIS

ORS 307.130 provides, in relevant part:

"(1) Upon compliance with ORS 307.162, the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

---

[1] All references to the Oregon Revised Statutes are to 1993.

"(a)   * * * only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

OWC contends that it qualifies as both a literary and charitable organization for property tax exemption.

## A.   *Literary Organization*

■      In applying ORS 307.130, the first question that must be answered is whether OWC is a literary organization.

"Literary societies are organizations for the propagation and spread of good literature rather than for one's own individual education." *Kappa Gamma Rho v. Marion County*, 130 Or 165, 176, 279 P 555 (1929).

The Oregon Supreme Court expanded this traditional definition in *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 319 Or 114, 119, 873 P2d 1083 (1994), where it found that:

"Without question, the scripts of plays—both contemporary and classic—fit within those definitions of 'literature.' * * * We think that it follows ineluctably from the foregoing that an organization that is devoted to the production of plays that expose actors and audiences to those scripts is a 'literary institution.'"

To verify that its broad interpretation of "literary" was consistent with legislative intent, the Supreme Court examined the historical meaning of "literary." The Supreme Court's research indicated that:

"Indeed, it appears that the term was being used in the comprehensive sense in which it still is used as early as 1734, when a young Samuel Johnson offered to produce an occasional column of a 'literary' nature * * *. We conclude, from the evidence available, that the word 'literary' meant in 1854 what it means today—of or pertaining to that broad range of written materials, including plays, that enjoy the label 'literature.'" *Id.*, 319 Or at 119.

■      It should be noted that most definitions and discussions of literary organizations imply or expressly suggest

that such organizations promote "good" or "excellent" literature.[2] However, history proves that what is deemed to be poor literature by one group or generation may well be considered a classic by another group or generation.[3] The court assumes the 1854 legislature had the wisdom to recognize this and did not intend for the courts to rule on the quality of literature promoted by a literary organization.

The evidence established that OWC's objective is to support the efforts of writers in producing literature. Although success is not required, one of OWC's members has become an international bestseller. Based on all of the evidence submitted, the court finds that OWC is a literary organization. It "propagates" literature within the meaning of OAR 150-307.130(1) by promoting the writing of literature.

B. *Charitable Objective*

In order for its property to be exempt, a significant portion of a literary organization's activities must have a "charitable objective." *Theatre West*, 319 Or at 117. This is perhaps the most ambiguous area within ORS 307.130. As this court previously stated:

> "It bears repeating that, although a literary institution must be for public benefit, its primary purpose need not be charity. If a literary institution had to be a charitable institution, the word 'literary' in the statute would be meaningless. By specifying literary and scientific in addition to charitable, the legislature expressly extended a tax exemption to institutions whose primary purpose is not charitable." *Theatre West of Lincoln City, Ltd. v. Dept. of Rev.*, 12 OTR 479, 482 (1993), *rev'd on other grounds* 319 Or 114, 873 P2d 1083 (1994).

In *Behnke-Walker v. Multnomah County*, 173 Or 510, 146 P2d 614 (1944), the Supreme Court held that a privately owned, for-profit business college did not qualify for property tax exemption. In so holding, it stated:

---

[2] As in all human endeavors, there is always a contrarian school of thought. *See Dark and Stormy Night* (Penguin Books 1984).

[3] For examples of contemporary judgments rendered on such writers as Honoré de Balzac, Emily Brontë, William Faulkner, Charles Dickens, and Mark Twain, see Christopher Cerf and Victor Navasky, *The Experts Speak*, 151-57 (1984).

"Upon viewing [the tax exemption statute] in its entirety, it is apparent that the legislature did not intend to exempt from taxation private property used for private profit, and that the only property, public or private, in fact exempted is such as 'has been sequestered or devoted to public uses.' " *Id.*, 173 Or at 520.

The clear line between for-profit corporations and nonprofit corporations marks only the base line. To qualify for exemption, a literary institution must be more than nonprofit. It is, therefore, necessary to distinguish an exempt or qualified literary organization from a nonexempt or nonqualified literary organization.

A qualified literary organization must be imbued with a sense of operating for the public good. This may be revealed in at least five different aspects:

(1) Membership. A qualified organization will either have no members, or its membership will be open to all and the organization will encourage and seek new members. It will have an attitude of outreach and will take steps to encourage individuals to become new members. In contrast, a nonqualified literary organization will resemble a private club where membership is by invitation and may be limited to individuals based on their qualifications, attributes or interests.

(2) Property ownership and use. The property of a qualified literary organization will be irrevocably dedicated for public benefit. If the organization ceases operating, the property must be transferred to an organization that also operates for public benefit. Although members may constitute the primary users of the property, open membership and open doors make it a public use. In a nonqualified literary organization, the property is held solely for the benefit of its members and admits of no public interest. In the event of dissolution or cessation of operation, the property or its sale proceeds will be distributable to the individual members.

(3) Administration. A qualified literary organization will be administered to reach out to the public as well as to its membership. It may hold public meetings, advertise for the public's benefit and promote its purposes with the public at large. It will seek public financial support in the form of

donations, grants, assistance or contributions. It will also seek the public's support in terms of its activities, approval by public leaders and cooperation with other public organizations. In contrast, a nonqualified literary organization will focus on its members and maximize their benefits. It will have minimal interest in public support and will look primarily to its members for the necessary funds for its operations.

(4) Activities. A qualified literary organization will engage in activities that are open to the public and encourage public participation. Although its members often constitute the primary participants, it will expend funds to involve the public in its activities by way of advertising, announcements, or solicitations. Its activities will compliment, build on, or enhance the activities and goals of other public organizations such as schools, theaters, or libraries. A nonqualified literary organization will have little concern for public participation. Its primary function is to provide for its own members. If it cooperates or works with other public organizations, then its primary motivation will be to enhance the benefits to its members rather than to the public.

(5) Public welfare. A qualified literary organization will be seen as promoting or providing good for society. Typically, it will assist government by providing a service or fulfilling a need that might otherwise be incurred by government. At the very least, its activities will assist and encourage a healthy society and public body. A nonqualified literary organization will be seen as promoting the interests of its members more than any public interest. Its activities may not be in conflict with government, but they will be designed for its own benefit rather than the good of the public.

Utilizing the above tests, the court finds that OWC is a qualified literary organization. Its membership and activities are open to the public without regard to race, creed, age or sex. Its property is irrevocably dedicated to the public and is used for activities that are public in nature. OWC is administered in such a way as to reach out to the public. It expends its own funds to advertise its workshops and activities. Its workshops for youth, particularly minority youth, assist the schools and other government agencies by enabling youth to

become literate and be able to express themselves. OWC's activities help society by promoting clear writing, literate citizens and creative writers.

■ The legislature exempted literary organizations from taxation to encourage the promotion of literature in society. Presumably, the legislature recognized the necessity and value of a literate society in order for a democracy to succeed. The charitable objective of a qualified literary society and the requisite "giving" is therefore found in the public nature of the organization.

Having determined that OWC is a qualified literary organization, it is not necessary for the court to determine whether it qualifies as a charitable organization. It remains, however, for the court to determine whether the subject property is used exclusively by OWC to accomplish its exempt purposes.

C. *Exclusive Use*

As might be expected with a voluntary organization, OWC's records with regard to the use of the property are somewhat lacking. Notwithstanding weak records, the preponderance of the evidence indicated that the great majority of the use of the property is to accomplish OWC's exempt purposes. Those periods when the property was vacant or unused are not so extensive as to appreciably affect the character of overall use. The evidence regarding actual use of the property was persuasive that it is used for the purposes and activities for which OWC is organized. The workshops, critique groups, and actual writing activities are uses of the property that promote the propagation of literature. Accordingly, the court finds that the subject property is exclusively used for exempt purposes within the meaning of ORS 307.130.

The department's Opinion and Order No. 95-1447 shall be set aside and judgment entered in accordance with this opinion.